

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
CRIMINAL ACTION
NO. 2004-10099

COMMONWEALTH

<u>vs</u>.

ANDRE WALKER[1]

<u>MEMORANDUM OF DECISION AND ORDER
ON DEFENDANT'S MOTION FOR A NEW TRIAL</u>

On December 9, 2005, a jury convicted defendant Andre Walker
of murder in the first degree of Francis Stephens based on
theories of deliberate premeditation and extreme atrocity or
cruelty, in violation of G. L. c. 265, § 1.  The jury also
convicted the defendant of armed assault with intent to murder
Jose Astacio, in violation of G. L. c. 265, § 18(b); and of
unlicensed possession of a firearm, in violation of G. L. c. 269,
§ 10(a).[2]

The defendant now moves for a new trial on the grounds that
he received ineffective assistance of counsel in violation of his
rights under art. 12 of the Declaration of Rights of the
Massachusetts Constitution and the Fifth, Sixth, and Fourteenth

---

[1]Courts customarily "spell the defendant's name as it
appears on the indictments," <u>Commonwealth</u> v. <u>Garcia</u>, 421 Mass.
686, 686 n.1 (1996); <u>Commonwealth</u> v. <u>Betances</u>, 451 Mass. 457, 457
n.1 (2008).

[2]The jury acquitted codefendant Willie Johnson of the murder
of Francis Stephens, of assault and battery of Jose Astacio by
means of a dangerous weapon, and of unlicensed possession of a
firearm.

Amendments to the United States Constitution.  For the following reasons, the defendant's motion is denied.

BACKGROUND[3]

In 2004, a Suffolk County grand jury indicted both defendant Andre Walker and codefendant Willie Johnson for the murder of Francis Stephens and for unlicensed possession of a firearm while not at home or at work.  The grand jury also indicted the defendant for armed assault with intent to murder Jose Astacio and indicted the codefendant for assault and battery of Astacio by means of a dangerous weapon.  Proceeding on alternate theories of principal and joint venture liability with respect to the charge of murder, the Commonwealth tried the defendant together with the codefendant before the Court sitting with a jury from November 9, 2005, to December 9, 2005.

As explained in the prosecutor's opening statement, the Commonwealth's theory of the case was that Francis Stephens and Jose Astacio were in the wrong place at the wrong time, mistakenly targeted for retaliation by the defendant and codefendant in an ongoing feud between rival groups in the Dorchester section of Boston.

The theory advanced at trial by both the defendant and

---

[3]The Court has attempted in this decision to harmonize the phonetic spellings that appear throughout the transcript.

codefendant was misidentification.  Defense counsel[4] in her
opening statement emphasized that police overzealousness and an
inadequate investigation played a significant role in the
misidentification of the defendant.  Both defense and codefense
counsel represented to the jury that the evidence would show that
the Commonwealth's key witnesses were not credible, largely on
the grounds of having received immunity or other consideration
for their cooperation and forthcoming testimony.

The Court recites in detail the evidence presented to the
jury during trial in 2005 and at the evidentiary hearing on the
defendant's motion for a new trial in 2008; the Court reserves
further details for discussion in conjunction with the specific
issues raised.

1. Commonwealth's case.  On November 14, 2005, the
Commonwealth called Monica Samuel, Francis Stephens's mother, who
testified to the following.  In September 2000, she and her
eighteen year old son had been living for about a year in a two-
family house on McLellan Street, which was within walking
distance of Blue Hill Avenue in Dorchester.  Her son had
graduated that spring from high school, where he had been captain
of the football team.  Over the summer he was taking classes at

---

[4]The Court refers to Elda James, the defendant's attorney
through trial, as "defense counsel" in the "Background" section
and as "trial counsel" in the "Evidentiary hearing" and
"Discussion" sections, infra.

the request of his football coach, who was trying to get him into college, as well as working, sometimes full-time, at Boston Medical Center.

Her son often spent time with a friend who lived in Franklin Field, and at about 7:00 P.M. on September 16, 2000, Samuel received a call from her son, who said that he was over at the friend's house.  Later that night, while at her sister's house, Samuel received a telephone call that her son had been shot, and, after arriving at Boston Medical Center, she learned that he had been killed.  The following day, she identified his body at the medical examiner's office.  She did not know of any conflicts between her son and anyone else and could see no reason why he had been shot and killed.

Neither defense counsel nor codefense counsel asked Monica Samuel any questions.

The Commonwealth next called John Rice, Francis Stephens's football coach at the Jeremiah Burke High School, who testified to the following.  He had known Francis Stephens well and, after Stephens' graduation, Rice and others at the school had worked with Stephens to get him into college.  On September 16, 2000, Stephens, a volunteer assistant coach for the 2000 football season, went with the football team to Chelsea High School for a game.  Rice last saw Stephens around 1:00 P.M., after the team returned to the Burke High School.  Rice did not notice anything

unusual or worrisome about Stephens's behavior on that day.

Neither defense counsel nor codefense counsel asked John Rice any questions.

The Commonwealth next called Jonathan Baskin, who testified to the following. At the time of trial Baskin worked for the Boston public works department. He had three children, aged six to twenty-four, and lived with them at 11 Harlem Street, very close to the intersection of Harlem and Glenway Streets in Dorchester. On September 16, 2000, he was home with his family, when at around 8:00 P.M. he heard "a loud bang, a shot." He jumped up and looked out his third-floor bedroom window toward Glenway Street, where he saw a dark-skinned African American man firing a gun in a downward direction. The shooter, who was "average height" -- five feet, eight to ten inches tall, was dressed in dark clothes and standing on the Glenway Street sidewalk near a light pole at the corner of Glenway and Harlem Streets. While Baskin looked out the window, he heard around eight gunshots. The shooter then jumped into a car that "took off" up Glenway Street. Baskin got a good look at the car and described it to police when they arrived; later, Baskin saw the car again on a nearby street. Baskin testified that two photographs fairly and accurately depicted the car which he had seen that night (exhibits 1 and 2). Baskin was not able to see the face of the shooter.

-5-

On cross-examination by defense counsel, Jonathan Baskin testified to the following.  After the shootings on September 16, 2000, he told police that he had seen an individual, who may have had braids in his hair, dressed all in black with a white T-shirt.  Baskin also told police that the shooter was five feet, six or seven inches tall.

On cross-examination by the codefense counsel, Jonathan Baskin testified to the following.  The shooter was "average height . . . five six to five eleven."  The shooter got into the passenger side of the car.  Baskin did not see a driver but denied that the shooter slid into the driver's side of the car: "It took off too fast."

On redirect examination, Jonathan Baskin acknowledged that he had to bend over and stick his head out the window to see the shooting.

The Commonwealth next called Jose Astacio, who testified to the following.  He had been incarcerated in federal prison since a 2002 conviction for "distribution" in Brockton.  When asked whether in September 2000 he knew a person by the name of Francis Stephens, Astacio answered, "I want to plead the Fifth."  In response to a question from the Court, Astacio testified to having been shot on September 16, 2000.  When Astacio then stated again his desire "to plead the Fifth Amendment," the Court called a recess, and Astacio stepped down from the stand.

The Commonwealth next called Boston Emergency Medical
Services (EMS) paramedic Roger Aiello, who testified to the
following.  On September 16, 2000, at approximately 8:15 P.M. he
and his partner responded to Glenway and Harlem Streets, where
they treated two shooting victims.  One victim, who Aiello later
learned was Francis Stephens, had three apparent head wounds and
was lying face down on the sidewalk -- "no movement, no
breathing, no pulse."  Stephens was later declared dead soon
after he was transported to Boston Medical Center.  The other
victim, who Aiello later learned to be Jose Astacio, was in
stable condition with a gunshot wound to his right thigh.  While
treating Astacio, paramedics observed that he "had a prior
gunshot wound on his chest wall from months earlier[,] before
September 16th."

Neither defense counsel nor codefense counsel asked Roger
Aiello any questions.

The Commonwealth next called Boston police Sergeant
Detective Randall J. Halstead, who testified to the following.
On September 16, 2000, Sergent Detective Halstead responded to
the corner of Glenway and Harlem Streets, where numerous
uniformed officers and emergency medical personnel were already
present.  As Sergent Detective Halstead began to process the
crime scene, he observed blood stains along the sidewalk and
spent shell casings scattered along the sidewalk and in the

crosswalk.  He also noticed a set of keys and a silver folding knife on the sidewalk.  At trial he described the ballistics evidence found at the scene: numerous spent shell casings, a spent projectile, a "pockmark" in the brick wall of a building from a bullet ricochet, three bullet strikes on a building, and a bullet fragment.

Defense counsel asked no questions of Sergent Detective Halstead.

On cross-examination by codefense counsel, Sergent Detective Halstead testified to the following.  He was in charge of another crime scene in the area of Fowler and Greenwood Streets and had assigned Officers Lyden and Christopher Carroll to secure that scene.  Sergent Detective Halstead received information that a Boston Red Sox hat was found in that area but was not involved in finding it.

On November 15, 2005, the Commonwealth called Sharod Clark, who testified to the following.  At the time of trial, he was twenty-five years old.  In the summer of 2000, he lived with his aunt and cousins on Angell Street, behind the Franklin Hill housing development in Dorchester, and was a member of a group called the Franklin Hill Giants.  Toward the end of the summer of 2000, problems arose between the Franklin Hill Giants and a group associated with the nearby Esmond Street area.

On September 16, 2000, the defendant talked with Clark and

-8-

his cousin, Jamal Kennedy, out on Angell Street.   The defendant told them that, earlier that day, "White got shot."   "White," who Clark knew to be Richard Green, was the leader of the Franklin Hill group and main supplier of "crack" cocaine in the Franklin Hill area.   The defendant then asked Clark and Kennedy to go with him to the Esmond Street - Fowler Street area to "kill anybody over there," but Clark refused.

Later in the day -- "around at night" -- Clark, who was at that time outside 42 Angell Street with Jamal Kennedy and Christopher Robinson, saw the defendant and the codefendant driving down Angell Street in a stolen Toyota Cressida.   The Cressida had been parked all day at the top of Angell Street. Clark had previously seen Terrence, who associated with members of the Franklin Hill group, driving that car.   The defendant was driving the Cressida, and both he and the codefendant were dressed in a "black hoodie, black gloves, and black skullie." When asked that time by the defendant to go "up the street," Clark acquiesced.

Clark, Kennedy, and Robinson followed the Cressida over to the Esmond Street area in Clark's car.   As they drove up Glenway Street, the codefendant started firing shots.   Of the three people Clark saw being shot at, one ran in a store and two "fell."   Clark did not see what happened to "the first guy" who fell but saw the second person lying on the sidewalk when the

defendant stopped the Cressida and got out of the car.  Clark had

pulled his car up a little ahead of the Cressida and saw the

defendant stand over the second person and shoot him.  When asked

at trial if he remembered anything about a dog, Clark said, "The

dog got shot."  Clark testified that, at some point, the

codefendant also got out of the Cressida and fired shots from

near the car.

 After the shooting stopped, both cars "took off," Clark's

car behind the Cressida.  Both cars then stopped at a nearby

intersection, and the defendant and the codefendant gave the guns

used in the shootings to Clark.  Clark hid the guns, both nine

millimeter semi-automatics, in a hamper in his aunt's house.  The

following day, Clark had a conversation with the defendant and

Kyron Childers during which the defendant talked about the

shootings.  At some point after the shootings, the defendant

asked Clark to return the guns, which he did.  Although Clark had

sold one of the guns, he managed to get it back.  Clark testified

that the car depicted in exhibit 1 was the Toyota Cressida driven

by the defendant and codefendant during the shootings on

September 16, 2000.

 Clark first told police in December 2003 about the shootings

in exchange for a promise not to be prosecuted for his

participation in the shootings; and Clark testified at trial that

he was not prosecuted for his participation.  He admitted to

having previously been convicted of assault and battery with a dangerous weapon and of unlawful possession of a firearm.

Clark testified that in the summer of 2000 he sold "crack" cocaine on Angell Street.  He received his supply of "crack" exclusively from his friend, Richard Green, in exchange for being permitted to sell the drugs in the Franklin Hill area.  Every day that summer, Clark went to the Franklin Hill development, where he saw people whom he knew well dealing drugs supplied by Richard Green.  Among other members of the Franklin Hill group, Clark named: the defendant, the codefendant, Anthony Vaughan, Marcus Miller, "Phee," and Stephen Murray.  Clark never saw the defendant selling drugs but testified that the defendant lived with a "female" in an apartment which was used for "crack" cocaine sales within the development.  Clark saw the codefendant and Hank Williams doing hand-to-hand deals within the housing development.  By the summer of 2000, Clark had known both the defendant and codefendant for about seven years; Clark identified them in court.

On cross-examination by defense counsel, Sharod Clark testified to the following.  For a long time he had a good relationship with Richard Green: Clark made a one-hundred percent profit on the drugs supplied by Green, and Clark's drug dealing territory was protected by Green.

Clark testified that he initially denied to the police in

2003 any role in the shootings on September 16, 2000, but then changed his story and admitted his involvement when testifying before the grand jury in this case.  His testimony at trial was being given in exchange for a promise that he not be prosecuted for any part of his involvement in the shootings, including as an accessory after the fact.

Clark testified at trial that, of the two people with him in his car during the shootings, only Christopher Robinson was still alive.

Clark denied that, although he parked in front of the Cressida, he could not see what was happening during the shootings.  Clark admitted, however, that, to observe the defendant during the shootings, Clark had not performed his job as a "lookout."

Clark testified before the grand jury that he did not "talk" because he was from Franklin Hill but admitted at trial having no difficulty speaking with police about the criminal activities of a number of people after he was arrested on July 8, 2001.

On cross-examination by codefense counsel, Sharod Clark testified to the following.  On September 16, 2000, he was out on Angell Street with Jamal Kennedy at about 4:00 or 5:00 P.M. when he heard that Richard Green had been shot.  The Toyota Cressida had been parked all day in the same spot at the top of Angell Street near American Legion Highway; a few days earlier Clark had

-12-

seen Terrence driving it on Angell Street.  On September 16, "as
soon as it got dark," Clark saw the defendant and codefendant in
the Cressida: the defendant was driving, and the codefendant was
in the passenger seat.  At that point, Clark was with Jamal
Kennedy, who had died by the time of trial, and, Clark was
absolutely certain, with Christopher Robinson.

During the shootings, Clark pulled his car up next to, but a
little in front and to the left of, the Cressida.  At trial, he
testified that he saw the codefendant out of the car for about
five seconds; he admitted that he had told the grand jury that
the codefendant was out of the car for a substantial period of
time.

Clark testified that, after the shootings, the Cressida went
down the street, took the first right, and stopped on the right
side of the street at the corner of Fowler and Greenwood Streets.
Clark followed and stopped in the middle of the street near the
Cressida for about twenty seconds.  He did not see any cars
driving on the street and did not see any people in the area.
Clark then took the guns to an aunt's apartment on Algonquin
Street in Dorchester that he visited every day.  While Kennedy
and Robinson waited outside with the car, Clark put the guns in
his pants, and went up the stairs to the fourth floor, casually
walked in the apartment, hid the guns under some clothes in the
hamper in his cousin Shondra's room (she was "barely there" and

-13-

often wore new clothes), and then left "like nothing happened."
About a week or two later Clark went back to retrieve one of the
guns; the same clothes were still in the hamper; no one had said
anything to Clark during that time about the firearms in the
hamper.

Clark testified at trial that saw three people and a dog at
the scene of the shootings, although he had told the grand jury
that he had seen two people and a dog.  He denied at trial that
he had lied, explaining that he "forgot" that it was three people
when he appeared before the grand jury.

Clark testified that on the night of July 3, 2001, he told
Boston police that he did not know who shot Anthony Vaughan,
despite having been present during the shooting.  Four days
later, however, after being arrested for various weapons offenses
that might have led to an armed career criminal charge and
possible ten year state prison sentence, Clark told police "from
hearsay [he] heard it was Black John" who had shot Vaughan.  In
July 2002, however, when asked by a federal prosecutor before a
federal grand jury, Clark testified that he did not know who shot
Vaughan.  At trial Clark admitted that he had "[p]retty much"
lied to Boston police about knowing who shot Vaughan; Clark
agreed that he did what it took to help himself.

With respect to the weapons offenses for which he was
arrested in July 2001, Clark agreed at trial that he "made out

-14-

pretty well" in the end: the armed career criminal charge was
dismissed; he never served a state prison sentence; and, after
pleading guilty, was sentenced in effect to serve eighteen rather
than thirty months in the house of correction. Clark believed
that he had spoken with Mike Devane from the Boston police
department to get what Clark agreed at trial was a "great deal."

Clark then testified that, although a 2004 arrest in
Stoughton for weapons and drug offenses violated the probation
that he was at that time serving for the prior weapons offenses,
he was not returned to jail. Clark's probation was instead
terminated the same day that he was found in violation.
Detective Mike Devane attended Clark's probation violation
hearing. Clark was sentenced to probation in Stoughton.

When Clark testified in December 2003 before the grand jury
in this case, he said, "Hey, my kids come first, so, hey, I was
there . . . at the scene of the shooting." Clark testified at
trial that he meant that he was going to do whatever it took to
protect himself and his kids.

Prior to testifying before the grand jury, Clark was told
that, if he testified against the codefendant and the defendant,
he would not be prosecuted for Stephens's killing or for hiding
the weapons used in that killing. Consistent with that
arrangement, Clark was testifying in court.

On redirect examination, Sharod Clark testified to the

-15-

following.   He read aloud a portion of his grand jury testimony
in which he said:

> Because I was down, I was part of Franklin Hill
> and like me going with them it was like nobody said
> nothing, you know, what I'm saying?  Like I didn't even
> know like the police knew who did it but you know, what
> I'm saying like they came to me and told me like you
> know what I'm saying we got little ways to it but you
> want to know the truth, I told you the whole truth, I
> was there and I witnessed everything.  It wasn't like I
> just heard it or if he say, she say.  I witnessed
> everything, I was there and I didn't tell because that
> wasn't the part I was supposed to play.
> Like to this day nobody don't still want me to say
> nothing, but hey, my kids come first so hey I was there.

Clark testified that, when he went before the grand jury in

December 2003, he had one child and Jamal Kennedy was still

alive.  Jamal Kennedy had since been shot and killed.  Clark then

testified that he received a year probation from the charges in

Stoughton and that the charges had not been dismissed.  Clark

testified that he, "Andre, Willie, Marcus, whoever," protected

Clark's territory, not Richard Green himself.

Clark affirmed that he was testifying truthfully at trial

that on September 16, 2000, he saw the defendant and codefendant

shoot at three people and saw two people fall to the ground.

Clark also affirmed that he was testifying truthfully before the

grand jury that he saw the defendant and codefendant do the

shootings on September 16.  Clark decided to testify about the

shootings because "[he] wasn't trying to go down for it so, and

that's what happened."

-16-

In response to a question from the jury that the Court
conveyed, Sharod Clark testified that his child was born on June
10, 1999.

On redirect examination Sharod Clark testified that he also
had a son who at the time of trial was a month old and a daughter
who was born on February 25, 1999.  His other daughter was born
in June 1999.

On recross-examination by codefense counsel Sharod Clark
testified that was referring to his two daughters when he said to
the grand jury that his kids come first and that his concern was
being away from his kids for a mandatory minium ten year sentence
in state prison.

The Commonwealth next called Sylvester Harrison, who
testified to the following.  At the time of trial Harrison was
thirty-four years old.  He had lived all his life at 8 Fowler
Street, which is close to Glenway Street.  In September 2000, he
was living there with his aunt, brother, and cousins.

On the evening of September 16, 2000, while Harrison was
driving in his neighborhood with his children, he heard gunshots
up ahead of his car in the direction of the intersection of
Glenway, Page, and Harlem Streets.  Harrison did not look in the
direction of the shots and instead put the car in reverse and
drove back down the street.  He then drove around on adjoining
streets before coming back onto Glenway Street.  As he drove

toward the intersection where he had heard the shots, he saw
someone on the ground by the store on Glenway.  Harrison
continued driving, took a right on Fowler Street, let his kids
out and waited for them to go inside their house at 70 Fowler
Street.  Harrison then backed his car down Fowler to Glenway,
where he was stopped by police.  Harrison told an officer that he
had come back down to Glenway because there was a car blocking
Fowler Street that appeared to have crashed into another car.

   At trial, Harrison could not remember what the car blocking
Fowler Street looked like and testified that he did not recognize
the car shown in exhibit 1.  Harrison testified that he "probably
could have" but did not remember telling the grand jury that he
had previously seen that same car at Harlem and Glenway Streets.

   Harrison testified that he spoke to police detectives in
February 2001 but did not recall telling them anything about the
car he saw on September 16, 2000.  He said that they showed him a
photographic array, told him that "it was a gang," and asked him
to identify anyone who had been in the car.  Harrison denied at
trial that he had selected any photographs; he stated that he had
never seen either the defendant or the codefendant before the
trial.  Harrison said that the officers knew he was drunk at the
time of the interview.  Harrison remembered telling the grand
jury that he said that he had picked out two photographs from the
array, but at trial Harrison did not remember selecting any

photographs.  Harrison stated that he never saw the shooters and
that he "didn't see their face" or "what they looked like"; he
saw only "a quick image" from the top of McLellan Street of two
people near a car.

Harrison testified that he lived in the second floor
apartment at 8 Fowler Street with his aunt and his sister; his
brother and his cousin, Troy Simpson, lived on the third floor.
Harrison had seen Kenie Smith at 8 Fowler Street.

Harrison thought that he told detectives that he saw two men
get out of a Toyota and start shooting but that he was just
"going by hearsay."  He then said, "I didn't see nobody shoot.
Actually, I did for a second, I [s]een somebody was shooting but
I didn't see it."  Harrison believed that the man he saw shooting
was the same man who drove the car and acknowledged that he might
have told detectives that.  Harrison ended his direct testimony
by stating, "But like I don't remember telling the detective that
I could see their face and I wish you'd stop asking me if I seen
the face because I'll keep telling you that I didn't."

On cross-examination by defense counsel, Sylvester Harrison
testified to the following.  He was just at the beginning of Page
Street, which is around seventy-five yards long, when he heard
the shots fired.

He was interviewed for over fifteen minutes by two or three
police officers in the hallway of his house some months after the

September 16, 2000, shootings.  Harrison was having a party that
night at his house and stated at trial that the officers "knew"
he was drunk: "you could smell liquor on me."  The officers
pressured him to make a selection from the array and at one point
asked him to guess: "It was like, could you, it could be him, it
could be him, it could be him."  Harrison repeatedly said at
trial that he did not select any photographs from the array and
emphatically denied seeing the face of a shooter.

On cross-examination by codefense counsel, Sylvester
Harrison testified that he had never before seen the codefendant.

The Commonwealth next called Stephen Murray, who testified
to the following.  At the time of trial, Murray was twenty-four
years old.  During the summer of 2000, he frequently visited his
grandmother in the Franklin Hill housing development.  On the
night of September 8, 2000, while walking with a friend in the
Esmond Street area, Murray was stabbed during a fight that
started after his friend "bumped into a couple of dudes."  Murray
did not remember what happened after his friend got him out of
the fight and dragged him across the street.  At some point,
Murray was taken to the hospital.

Defense counsel asked no questions of Stephen Murray.

Upon cross-examination by codefense counsel, Stephen Murray
testified that the September 8, 2000, fight quickly escalated
after his friend "bumped into a couple of fellows," that he and

-20-

his friend were outnumbered, and that the fight did not have
anything to do with drugs.

The Commonwealth next call Boston police Officer Brian
Mahoney, who testified to the following.  On September 16, 2000,
at approximately 8:15 P.M. he responded to a report of a shooting
at the intersection of Glenway and Harlem Streets.  After police
started to search the area, Officer Mahoney was directed by some
people to the end of Fowler Street, where there was a blue Toyota
with its engine running.  At trial, Officer Mahoney identified
that car as the car shown in exhibit 1.  The car was in a parking
space, and Officer Mahoney stayed with it until Officers Chris
Carroll and Bobby Lyden arrived.  Officer Mahoney "ran" the car's
license plate and learned that it was reported stolen from
another vehicle.  He observed some body damage to the front right
end and some ignition damage.

On cross-examination by defense counsel, Officer Mahoney
testified to the following.  He was the first officer to see the
car on Fowler Street and had been directed by someone to that
car.  He was later directed to a nearby Cadillac, next to which
was a blue baseball hat.

On cross-examination by codefense counsel, Officer Mahoney
testified to the following.  He heard the radio call about the
shooting at about 8:12 P.M. and was at the location of the
Cressida on Fowler Street "[p]robably" four to six minutes later.

-21-

A woman first approached him; then, after Officer Mahoney got to the car, a black male, who was on the corner of Fowler Street near the Cressida, approached him. Officer Mahoney was in uniform. The man, who was on the scene for a few minutes, did not want to give his name to Officer Mahoney.

The Commonwealth next called Boston police Officer Christopher Carroll, who testified to the following. On September 16, 2000, at about 8:10 P.M., he and his partner, Officer Robert Lyden, were the first officers to respond to Harlem and Glenway Streets. At some point after that area was secured by police, Officers Carroll and Lyden went to the intersection of Fowler and Greenwood Streets. There, they met another officer and eventually secured a black Toyota Cressida. A check of the registration indicated that it was stolen. Officer Carroll noticed that the front end of the car was heavily damaged. He identified the car as the vehicle shown in exhibit 1.

At Fowler and Greenwood, Officers Carroll and Lyden had a conversation with an individual who refused to identify himself. At some later point in time, either Officer Carroll or Lyden was able to locate and identify that individual as Sylvester Harrison. One of the officers provided that information to members of the Boston police department homicide unit.

Defense counsel asked no questions of Officer Carroll.

On cross-examination by codefense counsel, Officer Carroll testified to the following.  When he arrived at the intersection of Fowler and Greenwood Streets, Officer Mahoney was already on the scene.  The engine of the car parked at that location was still running.  At some point, as a result of a search conducted for evidence in that area, a Boston Red Sox hat was found.

The Commonwealth next called Boston police Detective John Martel, who testified to the following.  At the time of trial, Detective Martel was assigned to Area E-5 in the West Roxbury – Roslindale area of Boston.  He had been in the Boston police homicide unit for six years.

In September 2000, he, Sergeant Wyse, and Detective Primm of the homicide unit were assigned to investigate the death of Francis Stephens.  As part of that investigation, Detectives Martel and Primm spoke with Sylvester Harrison on February 13, 2001, at 9:00 P.M., after Harrison returned home from work.  The detectives interviewed Harrison in his kitchen and asked him questions about what he recalled of the September 16, 2000, shootings.  When questioned at trial if he noticed the effects of alcohol intoxication on Harrison, Detective Martel answered, "I wouldn't interview him if was [sic] under influence [sic] of any substance or alcohol."  During the interview Detective Martel asked Harrison to view a photographic array that the detective had put together in October 2000.  The detective identified a

-23-

copy of the array at trial (exhibit 35).  Harrison stated that he was not positive but selected two photographs that looked like the two people whom he had seen at the scene of the September 16, 2000, shootings.  Harrison pointed out photographs number two and four; Detective Martel testified that photograph number two depicted the defendant and photograph number four depicted Omar Greene.  Harrison told Detective Martel that the person depicted in photograph number two was the driver of a black Toyota and that the person depicted in photograph number four was the passenger.  Harrison said that he had seen the person depicted in photograph number two get out of the Toyota and shoot at two individuals on the sidewalk.

On cross-examination by defense counsel, Detective Martel testified to the following.  He limited the photographs in the array to those individuals whom he associated with the Franklin Hill Giants because that was "the direction" of the police investigation.  There were twelve photographs in the array.  The procedure used with Sylvester Harrison was the way photographic identifications were done by Boston police at that time, but the police department had since adopted a different procedure that involved the sequential presentation of photographs to a witness. Detective Martel denied believing that the sequential procedure was a more reliable or otherwise better method.

Detective Martel acknowledged that Harrison was not positive

-24-

about his identifications but said that Harrison was not shown

other photographs to see if he could make more certain

identifications.

Detective Martel was aware that a blue cap was recovered

from the Fowler Street area and submitted to the "crime lab" for

DNA analysis.

Detective Martel testified that the fingerprints of Isaac

Flowers were found in the interior of the Cressida and that the

fingerprints of Tyrone Turner were found on the license plate on

the car.

On cross-examination by codefense counsel, Detective Martel

testified to the following.  The second person identified by

Sylvester Harrison was not the driver.  Harrison said that he saw

the individuals' faces briefly.  Harrison did not know if he

could make an identification but said that he would try.  Omar

Greene, whose photograph Harrison identified as the passenger,

was someone Detective Martel associated with the group from

Franklin Hill.  Harrison did not select the codefendant's

photograph, which was number twelve in the array.

On redirect examination, Detective Martel testified that, in

an effort to follow up on the fingerprints, someone spoke with

Tyrone Turner and an attempt was made to speak with Isaac

Flowers.

On November 16, 2005, the jurors were taken on a view of

-25-

portions of the area depicted in the "Map/Street Plan," marked as exhibit 36.

On November 17, 2005, the Commonwealth called Kenie Smith, who testified to the following.  At the time of trial, Smith was thirty-two years old and lived with his five children and their mother.  He worked counseling adolescents, had a bachelors of science in management and a minor in marketing, and he was about to start school for a masters degree.

Smith decided to cooperate with law enforcement and tell them what he knew about the drug and gang activity on Esmond Street in May 2001, when he was arrested for a weapons offense and faced fifteen years mandatory imprisonment as an armed career criminal.  He had previously been convicted of assault with intent to kill, unlawful possession of a firearm, and possession of class B drugs.

Smith grew up on Esmond Street and considered himself a member of the Esmond Street group.  In the summer of 2000, he had a reputation as a "gangbanger" but was no longer "'banging."  He earned money from working and from making loans at a one hundred per cent premium to "fund[] . . . ventures" of people engaged in gun and drug activity.  He did not distribute guns or drugs himself but was sometimes involved in maintaining drug and gun connections with people outside the area, including from New York.  Smith was one of the more senior members of the Esmond

-26-

Street group, which, in the summer of 2000, included people from Fowler Street.  The group's combined territory covered part of Glenway Street.  At trial, Smith named various members of the group, including Darryl Green, Troy Simpson, Kevin Modlin, and Eddie Washington.

In September 2000, a "situation" arose between people from Esmond Street and people from Franklin Hill, after someone from the Franklin Hill area was stabbed by a person who "wasn't really anybody from Esmond" but sometimes stayed in a room in an Esmond Street house.  A couple of days after the stabbing, Smith and Richard Green, who "wanted the guy that did it," met at Reno's Pizza in Dorchester to resolve the situation.  Green broke off the meeting, however, unsatisfied by Smith's explanation that nobody from Esmond was involved, and later returned to confront Smith and members of the Esmond Street group.  Green was with a few of "the dudes from up the projects," including "Kane" and Andre, whom Smith identified in court as the defendant.  Tensions mounted at one point, and people reached for weapons; Smith saw several people, including the defendant, reaching toward their waistbands and heard several firearms being cocked.  At the sound of police sirens, however, people dispersed and ultimately nobody was hurt.

In the days that followed, somebody was shot on Esmond Street, and soon thereafter a shooting took place in Franklin

-27-

Hill.  ' Smith said that he was familiar with Anthony Vaughan, a person named "Buster," and Christopher Robinson and that they were all from Franklin Hill.  At some point, somebody shot a hole in Smith's vehicle while he was driving with his son on Angell Street.  Smith had noticed that a little Honda station wagon with people from Franklin Hill, including "Widget" and "Kane," had been following him.

On the morning of September 16, 2000, Smith was driving his minivan with Darryl Green, Eddie Washington, and Kevin Modlin; Smith, Green, and Washington each had a firearm.  Around 12:00 noon, they noticed Richard Green and Philip "Phee" in a car stopped in front of Sun Pizza on Blue Hill Avenue in Dorchester. Smith pulled in front of Richard Green's car, and Washington jumped out and started shooting into the windshield of Green's car with a .380 caliber pistol.  Washington then got back in Smith's minivan, and the four fled the scene: Washington got out somewhere on Vesta Road, the other three hid at Jonathan Hart's house on Harvard Street, having thrown the guns over a nearby fence.  Smith called his "girl" and told her to report the minivan stolen and called Troy Simpson and told him to create a diversion for the police, but police officers were soon "all over" Hart's house and eventually apprehended Smith, Darryl Green, and Modlin.  Police "had to cut [them] loose," however, after failing to find the discarded weapons and after

-28-

eyewitnesses to the shooting indicated that none of the three was Richard Green's shooter.  The three then went to Troy Simpson's house at 8 Fowler Street before eventually going home.

The next day, Smith learned that Francis Stephens, whose nickname Smith knew as "Frizz," had been shot and killed.  Smith had seen Stephens before in the area of Page Street near Glenway and McLellan Streets.  No one from Esmond Street discussed retaliating for the shooting because Stephens was not part of the Esmond Street group: "he wasn't from Esmond or Fowler.  He was, you know, he was an innocent victim."

On cross-examination by defense counsel, Kenie Smith testified that during the confrontation with Richard Green outside of Reno's Pizza, the defendant was to Smith's side and out of his line of vision.

Codefense counsel asked no questions of Kenie Smith.

The Commonwealth next called Akia Cheshire, who testified to the following.  At the time of trial, Cheshire was twenty-six and had four children.  In the summer of 2000, she was living with her sister-in-law, Lakeiva Mays, and the defendant in apartment number 76 on the first floor at 11 Fermoy Heights Avenue in the Franklin Hill housing development.  Darnell Mays, the father of Cheshire's children, also lived there but was incarcerated at the time.  Only Cheshire and the defendant had keys to the apartment.

Cheshire knew or recognized several of the people depicted

in exhibit 35, some of whom had been to her apartment.  She had also seen "White" in her apartment although she had not seen him speaking to or spending time with any of the people depicted in the array.  "Kane" was a friend of hers and the defendant's.

On the night of Richard Green's shooting in September 2000, Cheshire received a three-way call, originated by Darnell Mays, while she was at his and Lakeiva Mays's mother's house.  Prior to speaking with Darnell Mays, Cheshire heard another person speaking on the telephone but did not remember who that person was.  Afterwards, in the "[e]arly night," Cheshire went to her apartment.  No one was there, but the apartment was dirty and littered with trash.

Cheshire then testified that, about two or three weeks prior to Richard Green's shooting, she had seen the defendant in her apartment with a black gun.

On cross-examination by defense counsel, Akia Cheshire testified to the following.  She believed that it was in the afternoon or around noon time when she received the call from Darnell Mays.  She could hear someone else on the line, as though it were a three-way call.  After receiving the call from Darnell Mays and subsequently making a few stops to run errands, she returned to her apartment in the evening or early night accompanied by Lakeiva Mays.

She had told the grand jury that the defendant had her key

to the apartment and did not have his own key.  She remembered

telling police on January 22, 2001, that she had seen the

defendant with a gun a month or two prior to the shooting of

Francis Stephens.

Codefense counsel asked no questions of Akia Cheshire.

In response to a question from the jury that the Court

conveyed, Akia Cheshire testified that the defendant was not a

member of her family and that the defendant and Cheshire did not

have a romantic relationship.

The Commonwealth next called Jose DeJesus, who testified to

the following.  At the time of trial, DeJesus was twenty-eight

years old.  He lived in Brockton in September 2000 with his

daughter's mother but "knew everybody" in Franklin Hill from

having lived there for a number of years.  He knew "White;"

recognized several of the people depicted in exhibit 35,

including "Dre" and "Wax," whom DeJesus identified in court as

the defendant and codefendant respectively; and Richard Green's

brothers, Reggie and "Spot."

DeJesus used to go one woman's apartment in particular at

Franklin Hill that "everybody" visited to play video games, have

drinks, watch television, and socialize.  On the evening of

September 16, 2000, after he heard on the news that Richard Green

had been shot, DeJesus went to that apartment for about ten to

fifteen minutes to make sure that Green was all right and to use

the telephone.  Before he could make his call, however, Darnell
Mays called in from jail and asked DeJesus, who answered the
telephone, to complete a three-way call, which he did.

On cross-examination by defense counsel, Jose DeJesus
testified to the following.  His cousin, Gwenda Currette, is the
mother of Sharod Clark's children.

On September 16, 2000, DeJesus left work at Precision Door
and Window in Stoughton after 6:00 P.M., drove about forty-five
minutes to his home in Brockton, showered, and listened to the
news.  He then arrived at the apartment in Dorchester sometime
after 8:00 P.M., and, while he was there, the telephone call came
in "from Nashua Street."

On cross-examination by codefense counsel, Jose DeJesus
testified to the following.  He arrived in the apartment sometime
after 8:00 P.M.  While he was in the apartment, he did not see
any firearms, nor did he see anything different that night than
any other time he had been there: "it was quiet, just TV on."

On redirect examination, Jose DeJesus testified that he was
at the apartment "around" 8:00 P.M., "maybe."

The Commonwealth next called Christopher Robinson, who
testified to the following.  He was twenty-eight years old at the
time of trial.  He had grown up in Franklin Hill but had moved
away before the summer of 2000.  He was still friends with some
people from Franklin Hill in the summer of 2000, such as Jamal

-32-

Kennedy, and occasionally went there to play basketball.
Robinson had never heard the name Sharod Clark; when asked if he
recognized the person depicted in photograph number eleven in
exhibit 35, Robinson answered, "Yeah, that's Rizz or Roz or
something like that, no Sharod Clark." Robinson denied being
friends with that person and acknowledged just knowing him from
basketball. Robinson knew Richard Green from growing up
together; Richard's brother, Daryl, was one of Robinson's best
friends. In the summer of 2000 Robinson infrequently went to
Franklin Hill and denied knowing if drugs were sold there.

Robinson came to the grand jury in 2004 and learned at that
time "what was going on" from the assistant district attorney in
this case. Robinson did not know the person arrested for the
September 16, 2000, homicide.

On cross-examination by defense counsel, Christopher
Robinson testified that he did not recall being in a car with
Sharod Clark and Jamal Kennedy on September 16, 2000.

On cross-examination by codefense counsel, Robinson
testified to the following. After his aunt told him that Richard
Green had been shot on September 16, 2000, Robinson took his
aunt's advice that it would then be too dangerous to go out that
day. He denied being at the intersection of Harlem, Page, and
Glenway Streets that night at around 8:10 P.M.. Robinson was
close friends with Jamal Kennedy, who was deceased at the time of

-33-

trial.  Robinson was not in a car with Kennedy and "Roz" on the
night of September 16, 2000, nor did he witness a shooting in
Dorchester that night.

On redirect examination Robinson testified that the only
violent act that he had witnessed in Franklin Hill was against
his mom and that he had never seen anyone with a firearm.

The Commonwealth next called Lakeiva Mays, who testified to
the following.  She was twenty-five years old at the time of
trial.  She had four children and five brothers.  In the summer
of 2000, she lived in a Franklin Hill apartment with the father
of her child; Akia Cheshire; Darnell Mays, Lakeiva Mays's oldest
brother and the father of Cheshire's child; the defendant; and
sometimes the defendant's girlfriend, Sabrina.  Other people from
Franklin Hill, whom Lakeiva Mays came to know, visited that
apartment from time to time.  She recognized most of the people
depicted in exhibit 35 and said that she also knew Richard Green.

On September 16, 2000, after she heard that Richard Green
had been shot, Lakeiva Mays went to her mother's house for a
couple of hours with Cheshire, Sabrina, and Yvonne, Mays's niece.
During that time Lakeiva Mays answered a telephone call from her
brother that came routed through Cheshire's apartment because the
telephone at Mays's mother's house blocked calls made directly
from jail.  About 10:30 or 11:00 P.M. Lakeiva Mays, Cheshire, and
Yvonne went to Cheshire's apartment, which was dirty and littered

-34-

with food and bottles.  No one else was there at the time they arrived.

On cross-examination by defense counsel, Lakeiva Mays testified to the following.  Regarding the call received at her mother's house, Lakeiva Mays said that she could hear Joselito on the line and that he could not have gotten into Cheshire's apartment unless the defendant were also there.

Codefense counsel asked no questions of Lakeiva Mays.

On redirect examination, Lakeiva Mays testified that, from the background noises on the telephone line, it sounded like other people were in the apartment besides Joselito.

On November 18, 2005, the Commonwealth recalled police officer Christopher Carroll, who testified to the following.  At 9:53 P.M. on September 12, 2000, he was dispatched to 740 Blue Hill Avenue.  When Officer Carroll went around the corner onto Esmond Street, he found Gary Adams, who appeared to have been shot in the side.  EMS also responded to the shooting.

Neither defense counsel nor codefense counsel asked Officer Carroll any questions.

The Commonwealth next called Boston Public Health Commission EMS paramedic Graham Williams, who testified to the following. At 9:57 P.M. on September 12, 2000, he responded to Esmond Street, where he treated Gary Adams, who had two gunshot wounds to his abdomen.

Neither defense counsel nor codefense counsel asked Graham Williams any questions.

The Commonwealth next called Boston police Officer James Morrissey, who testified to the following. At around 1:15 P.M. on September 16, 2000, Officer Morrissey responded to 870 Blue Hill Avenue, the location of Sun Pizza, "for a person shot." When he arrived, he saw on the side of the street a car which had bullet holes through the windshield; shell casings were on the ground in front of the car. Inside Sun Pizza, Officer Morrissey saw a person, who was later determined to be Richard Green. Green, who was bleeding from his head and who appeared to have a bullet wound in his chest, was in the back of the pizza shop at a wash sink washing off the blood. Green initially refused help but eventually was treated by EMS and taken away by ambulance.

At some point Officer Morrissey and his partner went to 174 Harvard Avenue, where police had apprehended Jonathan Hart, Kevin Modlin, Darryl Green, and Kenie Smith as suspects in Richard Green's shooting. After a field interrogation observation report was done, the four were released.

On cross-examination by defense counsel, Officer Morrissey testified that he did not know if any of the four individuals whom he saw detained at 174 Harvard Street were prosecuted for the shooting.

Codefense counsel asked no questions of Officer Morrissey.

The Commonwealth next called Boston EMS Emergency Medical
Technician (EMT) Robert Stearns, Jr., who testified to the
following.  On September 16, 2000, Stearns and his partner
responded in their ambulance to 870 Blue Hill Avenue.  Upon
arriving, they entered a store and found a person, later learned
to be Richard Green, in the back of the store.  It looked like
Green had three gunshot wounds: one to the back of the head, one
to the right chest, and one to the right arm.  Although Green
initially refused treatment, he eventually let the EMTs treat him
and take him by ambulance to the hospital.

The Commonwealth next called Boston police homicide
Detective William E. Doogan, who testified to the following.
From June 1996 until March 2005, Detective Doogan worked in Area
B-3, where he became familiar with the Franklin Hill Giants, a
group that was associated with the Franklin Hill housing
development; he also became familiar with a group that was
associated with Esmond Street.

On September 9, 2000, Detective Doogan responded to 249
Harvard Street, just off of Blue Hill Avenue near Sun Pizza,
where he collected shell casings.  The night before, as he and
Detective Devane were exiting the Franklin Hill housing
development, they came across Stephen Murray, who had been

-37-

stabbed nearby.

Neither defense nor codefense counsel asked Detective Doogan any questions.

The Commonwealth next called Daryl Green, who testified to the following.  At the time of trial Daryl Green was twenty-six years old.  During the summer of 2000 he was living with his mother at 96 American Legion Highway, part of the Franklin Hill housing development.  He had lived in the Franklin Hill area his whole life.  He had two brothers, Reginald Green and Richard Green.  Daryl Green's nickname was "Spark"; his brother Reginald was also known as "Reggie"; and his brother Richard was also known as both "Bink" and "White."

On September 16, 2000, after learning that Richard Green had been shot, Daryl Green went with his aunt to the hospital to see Richard.  At some point after speaking with Richard Green and learning that he was all right, Daryl Green first went to his mother's house and then went to his girlfriend's house, where he stayed the rest of the night.  He recognized everybody depicted in exhibit 35 and was friends with them from Franklin Hill; he was sure that he did not speak to any of them during the afternoon or night of September 16, 2000.

Neither defense nor codefense counsel asked Daryl Green any questions.

In response to a question from the jury that the Court

-38-

conveyed, Daryl Green testified that he did not ask his brother
who had shot him because he "wasn't concerned. . . . [His] real
concern was that [his brother] be all right."

The Commonwealth next called Joseph Amaral of the Boston
EMS, who testified to the following.  On September 12, 2000,
Amaral responded to 15 Fermoy Heights Avenue, where he treated an
unidentified fifteen year old male, who appeared to have life-
threatening gunshot wounds: one to his chest and a second to his
left shoulder.  Amaral transported the fifteen year old to Boston
Medical Center.

Neither defense counsel nor codefense counsel asked Joseph
Amaral any questions.

All counsel stipulated that the name of the fifteen year
male whom Joseph Amaral had treated on September 12, 2000, was
Darius Jones.

The Commonwealth next called Boston police Detective Todd
Herron, who testified to the following.  On September 12, 2000,
at around 10:00 P.M. Detective Herron, along with Detectives
Black, Doogan, and McGoldrick responded to Fermoy Heights Avenue
in the Franklin Hill housing development.  Outside near the
playground area, a black male teenager, whom Detective Herron
later learned to be Darius Jones, was suffering from a gunshot
wound.  Boston EMS also responded to the scene, treated Jones,
and transported him to the hospital.

On September 16, 2000, Detective Herron responded to Harlem and Glenway Streets some time after 8:00 P.M. to assist other responding police officers in an investigation into the shooting of Francis Stephens. At some point, Detectives Herron and Primm spoke to Jonathan Baskin, a possible eyewitness to the shootings. Detective Herron was with Baskin at the intersection of Fowler and Greenwood Streets and recalled seeing the vehicle depicted in exhibit 1 at that location. When Detective Herron showed the vehicle to Baskin, Baskin provided information to the detective about it.

On cross-examination by defense counsel, Detective Herron testified to the following. Detective Herron did not recall specific reactions from people at the scene of the September 16, 2000, incident. Detective Herron did not ask Baskin any questions but was present when Detective Primm spoke to Baskin.

On cross-examination by codefense counsel, Detective Herron testified to the following. He could not recall what exact time on September 16, 2000, he arrived at Harlem, Glenway, and Page Streets but that it was at night because it was dark. Detective Herron did not have a conversation with Baskin but was present when Detective Primm interviewed Baskin. Detective Herron accompanied Baskin to a vehicle located at the intersection of Fowler and Greenwood Streets, where other officers were already present.

-40-

The Commonwealth next called Glennis Pena, who testified through an interpreter to the following.  In the summer of 2000, Pena was living at 78 Fowler Street with a female friend, Cluti Cruz; Cruz's boyfriend; and Pena's small daughter.  On the night of September 16, 2000, Pena and Cruz were on the porch of their house when they saw a car drive by very fast.  The occupants got out of the car further up the street and then got into another car and left.  Pena did not see the car crash into any cars parked on the street.  She did not speak with the police officers who later came to her house, but Cruz, who had stayed outside, did.

Defense counsel asked no questions of Glennis Pena.

On cross-examination by codefense counsel, Glennis Pena testified that her porch is on the second floor; she saw only one automobile speed down Fowler Street.

In response to questions from the jury that the Court conveyed, Glennis Pena testified to the following.  She saw two people get out of the car and then get into a second car which drove up behind the first car.  She did not see who the people were.

On cross-examination by defense counsel, Glennis Pena testified to the following.  She was present when police officers came into her apartment living room to speak with Cruz.  Pena did not remember specifically speaking with police but said that it

was possible that she told police that she had seen a car speed down Fowler Street.

On recross-examination by codefense counsel, Glennis Pena testified that the second car came very fast down Fowler Street after the first one. She could not determine how many people were in the second car. She was sure that she saw people from the first car get into the second car.

The Commonwealth next called Thomas Smythwick, who testified to the following. At the time of trial, Smythwick was twenty-two years old. He had lived with family near the Franklin Hill housing development for approximately thirteen years, and, at that time, his nickname among his friends in the area was "Noodles." Smythwick testified that, in the summer of 2000, he was friendly with, among others, Anthony Vaughan; people who lived at 11 Fermoy Heights Avenue, including a woman by the name of Akia; a person nicknamed "Yum Yum"; and "Spot," "White," and Reggie, whom Smythwick believed were brothers and each of whose last names he guessed was Green. Smythwick recognized all the people depicted in exhibit 35 and testified that they all knew each other. Smythwick recalled "Yum Yum" being shot but did not know exactly when and recalled that "White" was shot sometime shortly thereafter. Smythwick said that he knew Stephen Murray from Franklin Hill and knew that Murray had been stabbed but did not ever find out who stabbed him.

-42-

Smythwick, who visited Akia's apartment a lot in the summer of 2000, was in that apartment for about ten or fifteen minutes the evening after the Richard Green shooting.  While he was there, Smythwick heard "voices of men" coming from "the back room area" of the apartment, and he spoke with "Kane."

At the time of trial, Smythwick was serving a sentence for possession of a firearm and for armed robbery, both charges to which he had pleaded guilty.

Defense counsel asked no questions of Thomas Smythwick.

On cross-examination by codefense counsel, Thomas Smythwick testified to the following.  "Kane," whose real name Smythwick knew as Kyron Childers, was the only person whom Smythwick saw that night at Akia Cheshire's apartment.  Smythwick was only in the apartment for ten or fifteen minutes; he did not hear anybody making any threats, and he did not see any guns in the apartment. Smythwick believed that he was in the living room area of the apartment.  He did not see the codefendant there that night.

In response to questions from the jury that the Court conveyed, Thomas Smythwick testified to the following.  He did not remember if Akia Cheshire's apartment was ever or routinely left unlocked. "Pretty much" anyone could go in the apartment at any time, and neither Cheshire nor anyone else who lived there regularly had to be home to let people in to the apartment.

On redirect examination, Thomas Smythwick testified that

-43-

"[a]nyone in general" could go in the apartment, not just anyone from Franklin Hill.

The Commonwealth next called Boston police Officer Martin Lydon, who testified to the following.  He was with the ballistics unit in September 2000 and responded with other members of that unit on September 16, 2000, to the reported shooting at Glenway and Harlem Streets.  At the scene, Officer Lydon collected twenty-six nine millimeter shell casings, which, he testified, came from two separate weapons: twelve from one and fourteen from the other.  There were separate clusters of shell casings.  In court, he identified those spent shell casings, the bullets and fragments collected at the scene, and the bullet fragments obtained from the medical examiner's office.  He also identified a fragment that he believed had been removed from a dog.  Of the spent bullets obtained from the medical examiner's office, Officer Lydon concluded that three bullets were fired from one weapon and one bullet was fired from a second weapon; he was unable to make any conclusive findings on two additional bullets.

Officer Lydon testified that sometime after 1:00 P.M. on September 16, 2000, he responded to an incident at 870 Blue Hill Avenue.  At that location, he collected six spent .380 caliber shell casings, which he testified were all fired from the same weapon.  He said that the same weapon had fired the eight shell

-44-

casings that were collected on September 9, 2000, "opposite 249 Harvard Street."  He then testified that the .380 caliber shell casings collected on Blue Hill Avenue and .380 caliber shell casings collected on Harvard Street were all fired from the same nine millimeter weapon.

Defense counsel asked no questions of Officer Lydon.

On cross-examination by codefense counsel, Officer Lydon testified to the following.  At 1:16 P.M. on September 16, 2000, six .380 caliber shell casings were recovered on Blue Hill Avenue and, on September 9, 2000, eight .380 caliber shell casings were recovered at Harvard Street; those fourteen shell casings were fired from the same weapon.

With respect to the September 16, 2000, incident at Harlem and Glenway Streets, Officer Lydon testified that there were two separate firearms used in the shootings but acknowledged that the separate clusters of shell casings did not necessarily indicate that there was more than one shooter.

On redirect examination, Officer Lydon testified that there is some randomness to where the shell casings might end up, but that the scene of the September 16, 2000, shootings had an overall general pattern from which he could tell that, at some point, a particular weapon was being fired in or near a particular place.

In response to questions from the jury that the Court

-45-

conveyed, Officer Lydon testified to the following.  One cluster

of casings found at Harlem and Glenway Streets could have been

ejected from a weapon fired by a person sitting in a car, if the

car had not been not moving.  Officer Lydon said that he could

shoot fourteen rounds in six or seven seconds.

On recross-examination by codefense counsel, Officer Lydon

testified to the following.  He would expect to find most of the

shell casings on the ground even if the shooter were firing from

inside a car because the shooter would fire the weapon by holding

it outside of the car.  Officer Lydon could not say "absolutely"

where ejected shell casings would go but could tell from a

cluster of shell casings that the shooter of the weapon which had

ejected those casings was in a stationary position.

On cross-examination by defense counsel, Officer Lydon

testified that there was a range of barrel sizes for nine

millimeter weapons and that he could not tell from the recovered

spent shell casings the size of the nine millimeter weapon that

ejected those casings.

The Commonwealth next called Chief Medical Examiner for the

Commonwealth of Massachusetts Dr. Mark Flomenbaum, who testified

to the following.  The autopsy report performed on Francis

Stephens indicated that there were fifteen separate gunshot

wounds to Stephens's body.  None of the wounds "had any

indication of a range of fire," meaning the distance of the gun

to the body, and Dr. Flomenbaum could not state "the sequence of shots." Eight of the wounds, including three of the four to the head and five of the wounds to the chest and stomach areas, would have been independently fatal. Some of the bullets went front to back, others went back to front; some went very sharply upward, others sharply downward; most of the trajectories went from left to right. Certain exit wounds indicated that Stephens's body was "shored up against something," "absolutely consistent with" him being face down when shot. Some of the shots were "basically consistent with a rapid fire with very little movement of either [Stephens] or the shooter."

Neither defense counsel nor codefense counsel asked Dr. Flomenbaum any questions.

The Commonwealth next called Omar Greene, who testified to the following. At the time of trial, Greene was thirty-five years old. While he was growing up, he spent a lot of time in the Franklin Hill area. Greene identified by nickname most of the people depicted in exhibit 35 and confirmed that he was depicted as number four and known by the name "Tey."

After he heard that "White," his friend, had been shot, Greene went to Franklin Hill. He did not remember going into any apartments in the housing development that night, but said that, of the people depicted in exhibit 35, he saw "Spot" and "Eel."

On November 21, 2005, the Commonwealth called Officer Robert

-47-

Lyden.  During the summer of 2000, Officer Lyden became familiar
with an Esmond Street area group, which, among others, included
Daryl Green and Kevin Modlin.  Officer Lyden also saw Kenie Smith
"hanging around with those kids."  The group's territory covered
"Charlotte Street, Fowler Street, Glenway, parts of Harlem
Street, Old Road up by Michigan Ave[nue] as well."  In September
2000 Officer Lyden was also familiar with a Franklin Hill area
group that, since 1995, had used the name Franklin Hill Giants;
during that time, that group included the defendant ("[a.k.a.]
Dre Walk") and the codefendant ("[a.k.a.] Wax").  The Franklin
Hill Giants also included, among others, Richard Green ("[a.k.a.]
White Boy, [a.k.a.] White, [a.k.a.] Bing"), "Farmer" Smythwick
("[a.k.a.]  Noodles"), Anthony Vaughan ("[a.k.a.] Ant"), Henry
Williams ("[a.k.a.] Short"), Kyron Childers, ("[a.k.a.] Kane"),
Masai Mathis ("[a.k.a.] Pungy"), and Frederick Tillery,
("[a.k.a.] Patches").  Officer Lyden was not aware that any of
Richard Green's brothers were associated with the group.  Officer
Lydon believed that "Spot" was Daryl Green and that Reginald
Green was either Richard Green's cousin or brother.

Sometime after 8:00 P.M. on September 16, 2000, Officers
Lyden and Carroll were the first officers to respond to the
intersection of Glenway and Harlem Streets.  When they arrived,
they saw a black Hispanic male, who Officer Lyden later learned
was Jose Astacio, with a gunshot wound to his leg leaning against

-48-

a fence and saw a black male lying face down, motionless on the
sidewalk.  At some point after police cordoned off the area,
Officers Lyden and Carroll went to the corner of Fowler and
Greenwood Streets, where they met Officer Brian Mahoney, who
directed them to a black motor vehicle which had some front end
damage and which was still running.  Officer Lyden identified the
car depicted in exhibit 1 as the black motor vehicle which he saw
that night.

Officer Lyden then testified that, in July 2001, he, Officer
Carroll, and their supervisor, Sergeant Byrn, were involved in
the arrest of Sharod Clark for unlawful possession of a firearm
with a high capacity magazine.  Upon his arrest, Clark did not
provide information to either Officer Lyden or Carroll in an
attempt to receive a more lenient sentence; Officer Lyden, who
stayed in contact with the district attorney's office until the
disposition of Clark's case, was not aware that Clark received
lenient treatment in exchange for providing information to law
enforcement prior to the disposition of his case.

On cross-examination by defense counsel, Officer Lyden
testified to the following.  On September 16, 2000, he went to
the corner of Fowler and Greenwood Streets, where he observed the
black car depicted in exhibit 1.  He and Officer Carroll were
with the car until it was secured at Boston police headquarters.
The car's ignition area "was broken apart as if someone broke it

-49-

to start the motor vehicle," and there was a light-colored T-
shirt in the back of the car.

On cross-examination by codefense counsel, Officer Lyden
testified to the following.  He and his partner were the first to
arrive at the scene of the shootings at the intersection of
Harlem and Page and Glenway on September 16, 2000.  At the corner
of Fowler and Greenwood Streets, Officer Lyden saw a black Red
Sox hat on the street near an older model Cadillac that was
parked at the intersection of Greenwood and Fowler, across the
street from the Toyota depicted in exhibit 1.

Officer Lyden testified that he, Officer Carroll, and
Sergeant Byrne arrested Sharod Clark after Clark tried to fight
them.  Clark was a member of the Franklin Hill Giants; he lived
on Angell Street but also stayed with one of his aunts on
Algonquin Street.  When the officers patted Clark down, they
discovered a Glock nine millimeter gun with a large capacity
feeding device.  Officer Lyden testified that possession of the
gun subjected Clark to a mandatory year in prison and the large
capacity feeding device carried "more of a sentence, stiffer
penalty."  Clark was brought first to district court and then,
upon grand jury indictment, to Superior Court.  In addition to
the other charges, Clark was also charged with possession of the
ammunition, and, Officer Lyden believed, was "eligible for"
indictment as an armed career criminal.  Officer Lyden believed

-50-

that Clark was "always on probation," so a probation violation
for that arrest would not have been "out of the ordinary."
Officer Lyden was aware that Clark's charges were reduced to less
serious charges but was not part of the discussion that resulted
in the reduction of the charges and had no idea what transpired
between Clark, the homicide detectives, and the district
attorney's office with respect to those charges.

On redirect examination, Officer Lyden testified that the
baseball cap was found under the Cadillac on the side of Fowler
Street "opposite the Cressida."

The Commonwealth next called Natasha Flowers, who testified
to the following. At the time of trial, Flowers was twenty-four
years old. One of her sisters was Akia Cheshire; one of her
brothers was Isaac Flowers. Natasha Flowers lived in the
Franklin Hill housing development during the summer of 2000 and
visited Cheshire on occasion. Flowers knew a lot of people from
Franklin Hill; when shown exhibit 35, she recognized Cheshire and
"Dre," who lived with Cheshire, and she recognized "Kane."
Flowers recalled other people whom she did not know "hanging out"
in Cheshire's apartment. When Flowers stopped by that apartment
on the night "White" was shot, Cheshire was not there; "Dre," who
Flowers identified in court as the defendant, came to the door.

Neither defense counsel nor codefense counsel asked Natasha
Flowers any questions.

-51-

The Commonwealth next called Officer Greg Brown, who
testified to the following.  During his time in a specialized
gang investigation unit, he came to know a Franklin Hill area
gang known as the Franklin Hill Giants.  He had participated in
various undercover investigations into "street level dealing"
within the courtyards and hallways of the Franklin Hill housing
development, and by the summer of 2000 Officer Brown was familiar
with the criminal activity of some of the gang's members.  In the
summer of 2000, Officer Brown did not know the codefendant but
knew the defendant and people with whom the defendant associated,
including Sharod Clark, Masai Mathis, Kyron Childers, Antoine
Simmons, and Richard Green.  Most of those people had a "long
standing" association with Franklin Hill.  Richard Green was one
of Franklin Hill's "original gangsters," the group's perceived
leader, and a major supplier of "crack" cocaine to other Franklin
Hill members.

Defense counsel asked no questions of Officer Brown.

On cross-examination by codefense counsel, Officer Brown
testified that Sharod Clark engaged in drug dealing.

The Commonwealth next called Massachusetts State police
Trooper Patricia Riley, who testified to the following.  During
the summer of 2000, her task force conducted a joint
investigation with the Drug Enforcement Administration, the
Boston police department, and the Boston housing police into

-52-

"crack" cocaine dealing in the Franklin Hill area.  From that investigation, Trooper Riley learned that Richard Green was a main supplier to the individuals who sold "crack" cocaine in Franklin Hill.  The codefendant was observed three times during the course of that investigation with Henry Williams and once with Frederick Tillery.  Also on one occasion, Trooper Riley saw the codefendant "hanging out" with Richard Green, Williams, and Tillery in the courtyard within the Franklin Hill housing development.

On cross-examination by codefense counsel, Trooper Riley testified to the following.  The observations with respect to the joint investigation were made from the fall of 1999 to some point in 2002.  In the course of that investigation, Trooper Riley saw the codefendant in the presence of Richard Green only once, on August 12, 2000.  Trooper Riley was not in the Franklin Hill housing development on September 16, 2000.

The Commonwealth next recalled Omar Greene, who testified to the following.  After Greene stated that he did not recall whether he went to a particular apartment in Franklin Hill after learning that "White" was shot and stated that his memory was not refreshed from being shown his 2001 grand jury testimony, the Court permitted the assistant district attorney to read portions of Greene's grand jury testimony.  At the grand jury, Greene testified to the following.  After hearing that Richard Green had

-53-

been shot, Greene went to Akia's apartment in Franklin Hill for
five to ten minutes.  Greene did not know "Kane" or "Dre."
Greene did not see any guns in the apartment.  Greene then
testified at trial that he spent some time that night with
Reggie, his best friend.  Greene recognized the majority of the
people depicted in exhibit 35.  After Greene stated that he could
not recall seeing people familiar to him get in some cars, the
assistant district attorney read the portion of Greene's grand
jury testimony in which he testified to the following.  In Akia's
apartment, Greene spoke to "Spot," "Ill," and "Pungy" about
"White" and then subsequently saw those three individuals getting
in cars and leaving the Franklin Hill housing development.  Later
at the grand jury, Greene again said that he spoke to those
individuals and that "Ill" was Will.

Defense counsel asked no questions of Greene.

On cross-examination by codefense counsel, Greene testified
to the following.  "Wax," whom Greene knew and whose picture
Greene saw in exhibit 35, was not in Akia's apartment when Greene
went there after Richard Green was shot.  Greene did not see
"Wax" at all that night.  When Greene arrived in Akia's
apartment, he went straight to the back room, where he saw "Ill,"
"Pungy," and "Spot," one of whom opened "the door."  Greene later
saw "Ill," "Pungy," and "Spot" each drive away from Franklin Hill
by himself.  "Spot" drove a green Honda station wagon; and "Ill"

-54-

drove a big, green or blue, rented, four-door car.  Right as
"Ill," "Pungy," and "Spot" drove away, Greene left by taxicab,
and Reggie "hopped on the bus."

In response to a question from the jury that the Court
conveyed, Omar Greene testified that he could not say at what
time approximately he was in Akia's apartment.

On recross-examination by codefense counsel, Omar Greene
testified that "it was dark" when he left.

The Commonwealth next called Sergeant Detective Wyse, who
testified to the following.  In September 2000, he was working in
the Boston police homicide unit with Detectives John Martel and
Michael Primm.  On September 16, 2000, Sergeant Detective Wyse
responded to Harlem and Glenway Streets at approximately 8:30
P.M., by which time the scene had been secured by police and both
victims had been transported to the hospital.  Sergeant Detective
Wyse was the detective responsible for the investigation into the
death of Francis Stephens.  In that capacity, he supervised the
collection of evidence, the processing of the crime scene, and
the canvas of the area.  As part of canvassing the area that
night, members of the ballistics unit identified two individuals
on the third floor of 2 Harlem Street as being potential
witnesses.  Police also spoke with Jonathan Baskin and took
Baskin to the area of Greenwood and Fowler Streets, the location
of a Toyota Cressida.  Sergeant Detective Wyse said that a

-55-

baseball cap "was found on Greenwood going in the direction of
Erie Street from Fowler on the sidewalk."

On cross-examination by defense counsel, Sergeant Detective
Wyse testified to the following.  He was the supervisor of the
investigation, and, in that capacity, was aware of all the police
reports prepared in this case, of all the ballistics evidence,
and of the autopsy of Francis Stephens.  He was aware that, in
addition to Sylvester Harrison, an unidentified black male on
Fowler Street had also spoken with police on the night of the
shootings and given police some information regarding the
identity of the shooters.  Sergeant Detective Wyse was not aware
of any attempts to locate that person, and Sergeant Detective
Wyse never learned the person's name, address, or his telephone
number.  Sergeant Detective Wyse said that police only located
Harrison because one of the officers knew him; none of his
officers recognized the other person.

Sergeant Detective Wyse was aware that a baseball cap was
recovered on Greenwood Street.  He said that laboratory testing
found a mixture of DNA inside the cap but that the testing never
revealed whose DNA it was.  He said that the light-colored T-
shirt which was recovered from the black Cressida was submitted
to the Boston police crime laboratory for analysis, but he was
unsure what test was done.

Upon cross-examination by codefense counsel, Sergeant

-56-

Detective Wyse testified to the following.  He was in charge of the entire homicide investigation.  After he arrived at the scene of the shootings, he directed the supervising officer to have his officers canvas the area of Harlem, Page, and Glenway Streets. Information was relayed to Sergeant Detective Wyse that an automobile had been located at the intersection of Fowler and Greenwood Streets and that there was a Spanish-speaking witness, named Glennis Pena.  Sergeant Detective Wyse also received information that a Boston Red Sox baseball cap was found in the area and later was submitted to the Boston police crime laboratory for DNA evaluation and comparison to DNA samples obtained from Henry Williams, Reginald Green, and, Sergeant Detective Wyse believed, Kyron Childers.  Sergeant Detective Wyse said that, to his knowledge, nobody asked for a sample of DNA from the codefendant.

Sergeant Detective Wyse was aware from reading Officer Brian Mahoney's report that an unknown black male had approached Officer Mahoney and stated that two Hispanic males exited the "suspects' car" and possibly dropped something near a Cadillac up the street and fled in a Honda or Toyota.  Sergeant Detective Wyse never spoke to Officer Mahoney during the investigation. Sergeant Detective Wyse said that such a witness would have been important to his investigation and assumed from the report that the person refused to give his name and address to Officer

Mahoney.  Sergeant Detective Wyse did not know whether any
efforts were made to locate that person.

Sergeant Detective Wyse said that the Boston police officers
who "processed" the Toyota Cressida lifted fingerprints which
matched those of Tyrone Turner and Isaac Flowers; the
fingerprints matching those of Isaac Flowers were found on the
license plate, which had been reported stolen several days prior.
No other "identifiable" fingerprints were lifted.

On redirect examination Sergeant Detective Wyse testified
that the identification of a fingerprint did not allow him to
know when the fingerprint was placed on an object.

On recross-examination by defense counsel, Sergeant
Detective Wyse testified that he believed that a DNA sample from
the defendant was submitted for comparison with the stain on the
baseball cap found on Fowler Street and that the defendant was
excluded as a possible donor or depositor of DNA on the cap.

In response to a question from the jury that the Court
conveyed, Sergeant Detective Wyse testified that police submitted
the baseball cap for testing as part of testing everything
recovered from a homicide scene that may have value as potential
evidence.

On recross-examination by codefense counsel, Sergeant
Detective Wyse said that, in addition to the hat's location near
the Cressida, the hat was determined to have some value to the

investigation based on the report from the unidentified witness that something was possibly dropped near a Cadillac.

On November 22, 2005, the Commonwealth called Boston police department senior criminologist Christine Stevens, who testified to the following. With respect to clothes taken from Francis Stephens, Stevens noticed that "the upper body items such as the two shirts were . . . stained reddish brown and contained many holes." Stevens also noticed holes and tears in the pants as well as reddish brown stains on the pants. The reddish brown stains tested positive for the presumptive presence of blood. "Gunshot residue" was found on a T-shirt, a pair of pants, and a do-rag, but Stevens was not able to find a pattern on those items that would permit determining the range from the muzzle of the gun to the "target."

Defense counsel asked no questions of Christine Stevens.

On cross-examination by codefense counsel, Christine Stevens testified that two criminologists examined the Toyota Cressida and that no blood, hairs, or DNA was found that would have connected the codefendant to that automobile.

The Commonwealth next called Terrence Dotson, who testified to the following. At the time of trial, Dotson was twenty-two years old. He was born and raised with his younger sister in the Franklin Hill housing development; at the time of trial, his mother still lived there. While he was growing up in Franklin

-59-

Hill, he became familiar with "Willie and Dre," whom Dotson
identified in court as the defendants.  In the summer of 2000,
Dotson was involved in stealing cars, and, in September 2000, he
stole a dark colored Toyota Cressida, which Dotson identified as
the car shown in exhibit 1.  The car's ignition was not "busted";
the car was so old that Dotson was able to start it with his
house key.  At some point between the time he stole the car and
September 16, 2000, Dotson damaged the left side of the car in an
accident.

     After "White" was shot in September 2000, the defendant
asked Dotson to put gas in the Cressida and leave it near
Parkway, which he did.  About five or ten minutes later, Dotson
saw the defendant and "Kane" get into the car.  It was daytime,
about 3:00 or 4:00 P.M.  Dotson did not see the Cressida again
after he saw the defendant and "Kane" get into it.  About four
and a half or five hours later, Dotson saw the defendant with a
"bunch" of other people at what looked like a block party.

     Prior to appearing before the grand jury, Dotson spoke to
"[s]ome guy named Mike" at the police station about the Cressida.
Dotson had been arrested for armed robbery; Isaac Flowers "was
bagged afterwards."  Detective Devane did not promise that he
could do anything for Dotson in exchange for information from
Dotson.  While subsequently in custody, awaiting disposition of
the armed robbery charge, Dotson was not promised anything in

-60-

exchange for his testimony before the grand jury.  Dotson
eventually pleaded guilty to the armed robbery charge and served
eighteen months.  At the time of trial, Dotson was again in jail
and had a case pending.  Dotson was not made any promises with
respect to that pending case prior to testifying at trial, nor
was he told that he might receive consideration with respect to
his bail in that case.  Dotson did, however, expect his lawyer
would tell the judge at the bail hearing that Dotson had
testified in court in this case.

On cross-examination by defense counsel, Terrence Dotson
testified to the following.  He gave the car to the defendant and
"Kane" at 7:00 P.M., not at night time, as he had told the grand
jury.  He saw the defendant again at 8:30 P.M. somewhere at
Franklin Hill with a "bunch" of people at what looked like a
block party.  Dotson had told police that he had given the
defendant a maroon car, not a damaged black Cressida.  In the
summer of 2000, Dotson stole a lot of cars in "kind of like
a . . . game" he played with his friends.

When Dotson saw the defendant at around 8:30 P.M. on
September 16, 2000, the defendant got out of a 1999 Dodge Ram,
which Dotson thought was Mike's car.

Dotson denied remembering that he told the police in October
2000 that he believed that it was "Spot" and Reggie who had
committed the shootings of Francis Stephens and Jose Astacio.

Dotson denied remembering that he told police on October 9 that "Spot" shot "Frizz" in the chest and that Reggie finished him in the head but acknowledged telling police that "that was the word," meaning that was what Dotson had heard.

On cross-examination by codefense counsel, Terrence Dotson testified to the following.  On September 16, 2000, he gave the car to the defendant and "Kane."  The codefendant was not there. The car was parked behind Parkway, which is next to Angell Street.  After Dotson saw the defendant and "Kane" take the car at about 7:00 P.M., Dotson never saw the car again.  The gathering that appeared to be a block party which Dotson saw at around 8:30 P.M. was at the corner at 100 American Legion Highway, near to where Reggie Green and the Green family lived. Amongst the people Dotson saw gathered were, he thought, "Kane" and Mike.  Dotson either did not see or did not know "Pungy"; Dotson did not remember "Spot" Green being there; Reggie Green was not there; the codefendant was not there.  Dotson did not see the codefendant at all that day.

On redirect examination, Terrence Dotson testified to the following.  He remembered telling the police that it was the word "going around the hood [sic]" that Reggie and "Spot" had been involved in the shooting of "Frizz."  Dotson was not passing along what he knew to be true; he "wasn't involved."

In response to a questions from the jury that the Court

-62-

conveyed, Terrence Dotson testified to the following.  The car

shown in exhibit 1 was the car that he let the defendant borrow

that evening.  The defendant did not say why he wanted the car

that evening.

The Commonwealth next called Michael Boyd, who testified to

the following.  At the time of trial, Boyd was twenty-one years

old; he had two children and lived with their mother.  He grew up

in Franklin Hill and was friends during that time with the

defendant and the codefendant, both of whom Boyd identified in

court.  Among others, Boyd also hung out with "Sharizz" and

"Killer," whom Boyd also knew as "Kane" and by his real name,

Kyle.  Boyd knew "Pungy" and that his name was Masai Mathis,

"Widget" and that his name was Marcus Miller, "White" also known

as "Bink" and that his name was Richard Green, and "Short."

During the time that Boyd grew up in the Franklin Hill area, he

was familiar with a group named the Franklin Hill Giants who

associated together in Franklin Hill.

In September 2000, Boyd was under custody of the Department

of Youth Services (DYS) "for some other reason" than having been

found delinquent for a particular crime.  Approximately a week

after hearing that "White" was shot, Boyd called the defendant,

who said that he was living with his girlfriend, Co Co, at 828

Blue Hill Avenue.  During the conversation, the defendant asked

Boyd if the defendant could vote were he "on the run" "for a

body."

After Boyd was released from DYS custody in February 2001, he stayed with "Dre and his girl on 828 Blue Hill." Boyd and the defendant were close friends, and the defendant described to Boyd details of a murder. The defendant said that, after "White" was shot, a meeting that included "Kane," "Pungy," and "Noodles" took place "[a]t a female named Kia's house." The defendant said that he sent Terrence and "Turtle" to get a car and gave them a couple of dollars to put gas in it. The defendant indicated that, after that meeting, he was involved in a shooting during which he drove a vehicle, got out of the vehicle, and fired a weapon. The defendant told Boyd that nine millimeter guns were used in the shooting and that the defendant had obtained the guns from "White." The defendant told Boyd that one of the guns was given to Sharod after the shooting and that Sharod had traded or sold the other gun to pay off a debt, which "started up a little commotion" between the defendant, who wanted the gun back, and Sharod. The problem between the defendant and Sharod occurred while Boyd was living with the defendant.

After being released from DYS custody, Boyd was required to report to a daily reporting center on Angell Street and Blue Hill Avenue. One day on Angell Street, Boyd had a brief conversation with the codefendant; it was the first time since Boyd's release from DYS custody that he had seen the codefendant. During the

conversation, the codefendant said, "I caught one of those things," which Boyd understood to mean that the codefendant had just killed somebody.

Boyd testified that he had been arrested and convicted in 2002 for possession of a firearm and had served a year in jail and, upon release, was placed on probation.

After Boyd was arrested in November 2003 on counterfeiting charges, he had a conversation with Detective Michael Devane during which Boyd for the first time told police about statements made by the defendant and the codefendant.

In December 2003, Boyd told the grand jury that he recalled having a conversation with the defendant concerning a murder, during which the defendant said that the victim "wasn't even from where he was looking for[,] that he was from the [F]ield[,] but that didn't matter because we had a beef with them anyway." According to Boyd's grand jury testimony, the defendant also said that the shooting had been for revenge and that the defendant had thought that the victim was from the Esmond Street area.

On cross-examination by defense counsel, Michael Boyd testified to the following.  He denied being a paid informant but said that he had received $2,800 from a Drug Enforcement Administration agent, $300 from the Boston police department for moving expenses, and $100 from the Framingham police department.

Boyd testified that he did not talk with police about the

-65-

shootings until he was arrested in Natick for passing counterfeit bills.  Boyd told Natick police that he could give the Boston police information regarding murders.  Boyd denied at trial that he wanted to get paid by the Boston police for his information but testified that he wanted his "safety" and that he wanted to get out on bail.  He also acknowledged that his arrest was a violation of his probation; he was told that police could contact his probation officer on his behalf.  While Boyd was in custody in Natick, he gave police information regarding the shootings of both Francis Stephens and "White."  According to what Boyd told police that he had heard from Sharod, the defendant had stated that the two nine millimeter handguns used in the murder were buried.

On December 5, 2003, while under arrest, Boyd gave a tape-recorded statement to police.  In that statement, Boyd said that, a week after September 16, 2000, he called the defendant at the defendant's girlfriend's house on Blue Hill Avenue, where the defendant said he was living at the time.  Boyd also said that he had been told by the defendant that, among others, Akia Cheshire, Darnell Mays, and "Yum Yum" were present at the meeting at Akia's apartment.  At trial, Boyd testified that he was aware at the time of the statement that "Yum Yum" had been shot in the chest on September 12, 2000 but was not aware that Darnell Mays was incarcerated.

-66-

Boyd testified at trial that he told Boston police after his
2003 arrest in Natick that he was willing to help but that he did
not want to testify.  Boyd acknowledged that he might have asked
for consideration from the district attorney's office or asked to
be paid in exchange for his testimony.

Boyd remembered telling the grand jury that the defendant
had told him that, on September 16, 2000, three cars went out
looking for people all over the Harlem Street and Glenway Street
area.  Boyd remembered telling the grand jury that the defendant
said that he had circled the block in the area of Glenway and
Harlem Streets a few times as though looking for somebody.

On cross-examination by codefense counsel, Boyd testified to
the following.  When Boyd saw the codefendant for the first time
since Boyd was released in February 2001 from DYS confinement,
the codefendant said to Boyd, "I caught one of those things."
Boyd testified that the expressions "I got one and I caught one"
meant two different things.  Boyd remembered giving a tape-
recorded statement on December 5, 2003, to Sergeant Detective
Wyse and Detective Michael Devane of the Boston police department
but denied remembering that he said to those officers that the
codefendant had told him, "I got one."

Boyd testified that after he was arrested on November 13,
2003, for trying to pass a counterfeit hundred dollar bill at the
Natick Mall, he asked Natick police to call Detective Devane.

-67-

Boyd, whose bail was set at $3,000 because he did not have identification, hoped to be released on a lower bail after Detective Devane identified him.  Although Boyd did not expect it, Detective Devane drove out to Natick and talked with him. Boyd asked Detective Devane what the detective wanted to know and then gave him certain information.  At the time, Boyd was on probation for weapons and other offenses and knew that he could receive an eighteen month sentence for violating his probation by being arrested.  Boyd was released on bail in Natick, although he remained in custody at the Nashua Street jail as a result of his probation violation until December 17, the day he appeared before the grand jury.

A year later, Boyd became involved with the Drug Enforcement Administration, an agency for which he had been paid thousands of dollars working as an informant.  What Boyd was paid depended on the kind of work he did; he did not know if he would get paid after testifying in court in this case.

On redirect examination, Michael Boyd testified to the following.  Boston police had not told Boyd that they would be able to get him out of jail on November 13, 2003; with respect to Boyd's bail situation, they told Boyd that it was up to him and that they could not make any promises.

When Boyd spoke to Boston police on November 13, he was concerned for his safety.  He thereafter received money for

moving or storage expenses because he feared for his family's safety; Boyd had moved away from the Boston area because of his involvement in this case and had received cash assistance to move.

In response to questions from the jury that the Court conveyed, Boyd testified to the following. Since the beginning of this case, Boyd had been charged with filing a false police report but no other crimes.

Boyd said that "caught" can only mean "caught a body" but that "got" can mean either "got a body" or "got a gun."

Regarding the disagreement between the defendant and Sharod Clark, Boyd was told by the defendant that, because Clark was "playing games with the guns," the defendant had to find all the guns and take them from Clark.

On redirect examination, Boyd testified that the charge of filing a false police report was brought by a police department outside of Boston; that no one from the Boston police department was involved in bringing that charge; and that he had not asked anyone from either the Boston police department or from the Suffolk County district attorney's office for any assistance with respect to that case in exchange for testifying in this case.

On recross-examination by codefense counsel, Boyd said that on December 5, 2003, he told Boston police that the codefendant said, "You know I got one"; Boyd did not say that the codefendant

told him that he had "got one of those things," meaning a body.

The Commonwealth next recalled Jose DeJesus, who testified that he still did not remember whom from exhibit 35 he saw in Akia's apartment on September 16, 2000, and that his memory was not refreshed from reading his 2001 grand jury testimony. The Court then permitted the assistant district attorney to read a portion of DeJesus's grand jury testimony, in which he identified everyone depicted in exhibit 35 and testified that "Dre," "Kane," "Pungy," "Noodles," and "Wax" were in the apartment that night; Daryl Green, "Tey," Hank, Will, "Chizz," and Chevre were not there.

On cross-examination by defense counsel, Jose DeJesus testified to the following. On September 16 he was in Akia's apartment sometime after 8:00 P.M. for ten or fifteen minutes, "to use the phone briefly." After he left, he never saw the defendant again that evening.

On cross-examination by codefense counsel, Jose DeJesus testified to the following. He did not remember at trial whether "Wax" was really in the apartment that night; DeJesus acknowledged that he may have been confused and remembered "Wax" being there another day. When DeJesus was briefly in the apartment around 8:00 P.M., he did not see any firearms and did not hear anybody there saying that they wanted to retaliate for Richard Green's shooting. He could not recall how many people

-70-

were in the apartment and could not be sure whether he was thinking of the night of September 16.

The Commonwealth next called Officer Vance Mills. Officer Mills was familiar with the Franklin Hill housing development, and on September 16, 2000, at approximately 11:00 P.M., Officer Mills saw and briefly spoke with the codefendant on Fermoy Heights Avenue. The codefendant was with some other people, including Antoine Simmons, Labelle Norman, and Marvin Carr.

On cross-examination by defense counsel, Officer Mills testified that he did not talk with the defendant at that time.

On cross-examination by codefense counsel, Officer Mills testified to the following. When he saw the codefendant, Officer Mills was on routine patrol, making note of people on Fermoy Heights Avenue. The codefendant was dressed in a brown or tan jean suit and wore brown boots. The codefendant was cooperative, and Officer Mills did not recall him being evasive in any way. Officer Mills took note of other people who were with the codefendant: Robert Hall, Lavalle Norman,[5] John Wilcox, and Marvin Carr. Officer Mills testified that he did not see any of the people depicted in exhibit 35 in the area in which he observed the codefendant that evening.

The Commonwealth next called Anthony Baptiste, who testified

---

[5]"Lavalle Norman" presumably is the same person referred to in the transcript of Officer Mills's direct examination as "Labelle Norman."

-71-

to the following.  At the time of trial, Baptiste was twenty-eight years old.  In September 2000, he lived at 20 Page Street in Dorchester, where he had lived for years, and, at the time of trial, still had family at that address.  On September 16, 2000, between 7:00 and 8:00 P.M., Baptiste saw Jose Astacio, whom he knew from Brockton, on the street with another young man, who was walking a pit bull.  Baptiste did not know by name the person who was with Astacio but had seen him near Page Street on McLellan.  Baptiste was going to the barber shop but walked with Astacio and the other person to the corner store.  While they were talking on the corner, a gunshot "rang out," and Baptiste ran off without looking back.  He returned to the scene after the incident ended and "found out they got hit, the dog got hit and the dude got hit."  By "dude," Baptiste referred to the person who was walking the dog.  Baptiste left just before the police came but talked with police some months later after police "got word" that he had been at the scene.

On cross-examination by defense counsel, Anthony Baptiste testified to the following.  He knew that Astacio had had some trouble with people from Brockton; Baptiste had "saved [Astacio's] life," when "[s]ome kids wanted to kill him" during one confrontation.

On cross-examination by codefense counsel, Anthony Baptiste testified to the following.  On September 16, 2000, when he heard

-72-

the gunshots, Baptiste ran into a store and hid behind some plexiglass.  He did not see any cars pull up.  He did not see who was doing the shooting or how many shooters there were because he ducked and ran.  Baptiste said that he "knew what to do in a situation like that" because he had been shot at some point when he was with Astacio.  Baptiste testified that the incident with Astacio in Brockton occurred years before September 16, 2000.

The Commonwealth next called Detective Michael Devane, who testified to the following.  At the time of trial, Detective Devane was a detective with the Boston police homicide unit and had been with that unit since February 2002.  He had been with the Boston police since 1988 and had previously been assigned to Area B-3 in Mattapan.  During the time he had been with the Boston police department, he had become familiar with the Franklin Hill area and people from that area, including the defendant and the codefendant, whom Detective Devane identified in court.

On the night of September 12, 2000, Detective Devane responded to the shooting of Gary Adams in the area of Esmond Street and Blue Hill Avenue and then to the shooting of Darius Jones, whom Detective Devane also knew as "Yum Yum," in Franklin Hill.

On September 16, 2000, Detective Devane went to Boston Medical Center to talk with Richard Green "from Franklin Hill."

-73-

While speaking with Richard Green, Detective Devane received a call regarding the shootings of Francis Stephens and Jose Astacio; Detective Devane was in the emergency room area when Stephens was pronounced dead.  Detective Devane then assisted Sergeant Wyse and his squad in the homicide unit.

On October 9, 2000, Detective Devane interviewed Terrence Dotson, who was in custody at the time.  Detective Devane was also present when Dotson was brought before the grand jury the following year.

On November 13, 2003, Detective Devane went to Natick to discuss Francis Stephens's murder with Michael Boyd, who was in custody and whom the detective had known since 1998 or 1999 from the Franklin Hill development.  Detective Devane said that he could not promise Boyd anything but offered to "pass on" to the district attorney's office any information that Boyd provided. Detective Devane also spoke with Boyd about Stephens's murder prior to Boyd's grand jury appearance, and Detective Devane was present when Boyd testified before the grand jury.

Detective Devane knew Sharod Clark and had first met him in July 2000 when Clark was arrested.  Clark pleaded guilty to the charges stemming from that arrest, but neither his guilty plea nor his sentence was the product of any information that Clark provided to police.  Later, Detective Devane twice interviewed Clark about the July 2001 shooting of Anthony Vaughan.

-74-

Detectives Devane and William Doogan were the investigating officers and were responsible for any charges brought in that case.  Although Clark "made indications of persons that he believed to be responsible" for the shooting, none of the information that Clark provided resulted in Detective Devane bringing charges against anyone.  Detective Devane did not attempt to get Clark a more lenient sentence based on the information that Clark provided to Detective Devane with respect to the Vaughan shooting.

In December 2003, Clark provided information about the Francis Stephens killing to Detective Devane, who was then working in the homicide unit.  Detective Devane had already spoken with Michael Boyd.  Detective Devane told Clark that police thought that he might have some responsibility in the shootings.  Detective Devane did not give any information or names of suspects to either Boyd or Clark.  Detective Devane has remained somewhat in contact with Clark and testified that Clark no longer lives in the Boston area.

On cross-examination by defense counsel, Detective Devane testified to the following.  He went to Natick because the Natick police had telephoned his office telling him that Boyd wanted to talk with him.  When Detective Devane arrived, Boyd said that he had information that pertained to the shootings of Stephens and Astacio.  In addition to wanting to be released on bail, Boyd had

-75-

some concern regarding his probation; Detective Devane said that

he would let Boyd's probation officer know that Boyd had been

arrested but denied at trial saying that he would let Boyd's

probation officer know that Boyd was helping with the detective's

investigation.

During Terrence Dotson's interview with Detective Devane,

Dotson "[i]nitially" told the detective that "Spot" and Reggie,

Richard Green's brothers, were the two people who shot Francis

Stephens.  Dotson also said that he had given the defendant a

maroon Toyota with front end damage; Dotson did not mention

anything about a black Toyota Cressida at that time.

Detective Devane remembered being told by Michael Boyd that

Boyd had heard that the guns involved in the shootings had been

buried.

On cross-examination by codefense counsel, Detective Devane

testified to the following.  Although Sharod Clark had initially

denied being able to identify anyone involved in the July 2001

Vaughan shooting, five days later Clark gave information to

Detective Devane about that shooting after Clark was arrested and

charged with various weapons offenses that potentially could, and

later did, lead to Clark's indictment as an armed career

criminal.  Clark was at times distraught during the interview and

admitted that he had not been honest when he had previously

spoken with Detective Devane about the Vaughan shooting.  Clark

told police that "Black John" had been involved; but, when shown
a photographic array, Clark did not select the photograph of the
person who police knew went by the name "Black John."

Detective Devane told Clark in December 2003 that the
detective believed that Clark had more involvement in the
Stephens shooting than Clark had previously admitted.  Detective
Devane did not discuss any "promises" when he spoke with Clark.

When Detective Devane and Michael Boyd spoke at the Natick
police station, Boyd asked for certain consideration in exchange
for speaking with the detective, but Detective Devane said that
he did not have that authority.

By the time of trial, Detective Devane was aware that Clark
had agreed to testify in exchange for not being charged "with the
firearms in connection with this murder"; Detective Devane said
that charging Clark with the murder had not "come into
play . . . ."

Detective Devane did not believe that Clark was being
completely accurate when Clark described his role as providing
cover and blocking traffic during the September 16, 2000,
shootings.

On redirect examination, Detective Devane testified to the
following.  In the end, Terrence Dotson said that his statement
to Detective Devane about Reggie and "Spot" was not true; Dotson
"had kind of made that up and he recanted that end."  Dotson

eventually recharacterized his statement about the involvement of
Reggie and "Spot" in the murder as merely something that Dotson
had heard, and ultimately Dotson denied that he had even heard of
their involvement.

On recross-examination by defense counsel, Detective Devane
testified to the following.  Detective Devane remembered Dotson
telling him that "Spot" shot "Frizz" in the chest and Reggie
finished him in the head, but that then Dotson "recanted and
backed off that portion of the statement . . . ."  Dotson told
Detective Devane, however, that the "information about the maroon
Toyota with the front end damage and the money for gas was all
true."

On November 29, 2005, the Commonwealth rested its case.

2. Codefendant's case.  Codefense counsel called Boston
police Sergeant Kevin McGoldrick, who testified to the following.
At about 8:15 P.M. on September 16, 2000, Sergeant McGoldrick
responded to the Glenway Street and Harlem Street area of
Dorchester, where he participated in the investigation at the
scene.  As part of that investigation, he spoke with Glennis Pena
with translation assistance from a person whom Sergeant
McGoldrick believed was her son.  Pena indicated that she had
seen a black car speed down Fowler Street and stop at the end of
Fowler and Greenwood.  She said that there were two black males
in the car and that both fled up Greenwood towards Erie Street.

-78-

She described both of them as slim and of unknown age. She did
not say anything about a second car driving down Fowler Street.
Sergeant McGoldrick's impression from that interview was that
Pena had observed two individuals who were in one car that sped
down Fowler Street and who then left on foot towards Erie Street.

Defense counsel asked no questions of Sergeant McGoldrick.

On cross-examination by the Commonwealth, Sergeant
McGoldrick testified to the following. The boy with whom
Sergeant McGoldrick spoke was ten years old. The woman with whom
Sergeant McGoldrick spoke made no mention of a second car, but
Sergeant McGoldrick did not ask her if there were any other
vehicles involved besides the speeding car. At the time of the
conversation, Sergeant McGoldrick was aware that a car had been
located at the end of Fowler and Greenwood that may have been
involved in the murder, and he was not concerned with whether
other cars were involved.

On redirect examination by codefense counsel, Sergeant
McGoldrick testified that he was concerned about getting the
witness's impression of what she saw and was interested in any
information that she had, but that his focus was the car found at
the end of Fowler Street.

Codefense counsel then read a stipulation of how Sergeant
Detective Wyse and Detective Michael Devane would have testified,
if recalled to the witness stand: during a December 5, 2003,

-79-

tape-recorded interview with them, Michael Boyd three times said that the codefendant said to him, "You know I got one."

Both the codefendant and the defendant then rested.  The Commonwealth did not offer further evidence.

3. <u>Closing arguments</u>.  In her closing statements, defense counsel returned to the theory of misidentification, attacking the Commonwealth's evidence of the defendant's participation in the shootings.  She urged the jury to discount as not credible the Commonwealth's witnesses who had received compensation or leniency in exchange for their testimonies, and she pointed out inconsistencies in that evidence.  She highlighted inadequacies of the police investigation, including the failures to follow up on potential suspects and to conduct forensic testing on the T-shirt found in the Toyota Cressida on Fowler Street; she particularly focused on the unreliability of Sylvester Harrison's identification and argued that it resulted in part from an improperly suggestive procedure.  She observed that the forensic testing which police had performed was exculpatory of the defendant.  She noted the paucity of evidence of the defendant's motive to retaliate for Richard Green's shooting and suggested that Sharod Clark or Richard Green's brothers were more likely to have reason for retaliation.  She alternatively suggested that Jose Astacio could have been the intended target by those in Brockton who had targeted him before.  Finally, she contended

that the defendant could not have had time to walk from the car
abandoned on Fowler Street, as did the person described by
Glennis Pena to Detective McGoldrick, to the Franklin Hill block
party, where the defendant was seen, by 8:30 P.M.   Defense
counsel concluded that the absence of credible incriminating
evidence created ample doubt of the defendant's guilt.

In his closing statements, codefense counsel reminded the
jury of the presumption of innocence and of their duty to give
separate consideration to the evidence against the codefendant.
Codefense counsel then also returned to the theory of
misidentification, in part echoing defense counsel's attacks on
the credibility of the Commonwealth's witnesses.   Codefense
counsel argued that Sharod Clark's testimony in particular was
part of Clark's demonstrated pattern of self-serving fabrications
and that Michael Boyd's testimony too conveniently, and
unclearly, implicated the codefendant.   Codefense counsel
contended that, but for the testimony about selling drugs and
associating with supposed gang members, the remainder of the
Commonwealth's case noticeably omitted the codefendant: Terrence
Dotson did not see the codefendant on September 16, 2000; at best
conflicting evidence put the codefendant in Akia Cheshire's
apartment on the night of the shootings; Sylvester Harrison
identified someone else as a participant with the defendant in
the shootings; no forensic evidence linked the codefendant to the

Toyota Cressida found on Fowler Street.  Codefense counsel

concluded that the Commonwealth's case against the codefendant

was the "definition of a not guilty" and should never have been

brought.

In the prosecutor's closing statements, he first pointed out

that the killing of Francis Stephens, who by no one's account was

involved in any criminal activity, could only be explained

through the context of the Esmond Street - Franklin Hill

conflict.  The prosecutor recounted the evidence with respect to

that feud and how it fit together to establish the defendant's

and codefendant's motive for the shootings.  The prosecutor

indicated that the evidence put both the defendant and

codefendant at Akia Cheshire's apartment, the staging ground for

the shootings.  The prosecutor focused on the consistencies

between the testimonies of the Commonwealth's four eyewitnesses

and the forensic evidence as corroboration of its acknowledged

"star witness," Sharod Clark.  The prosecutor explained the

inconsistencies to which defense and codefense counsel adverted

as honest mistakes of excited and reluctant eyewitnesses or the

result of other witnesses' faded memories.  The prosecutor

portrayed Christopher Robinson's and Daryl Green's accounts of

their respective actions on September 16, 2000, as improbable and

untruthful.  The prosecutor contended that police had followed

viable leads and chosen to conduct likely fruitful forensic

-82-

testing; other avenues of investigation mentioned by defense counsel were hypothetical or of improbable benefit. The prosecutor told the jury that from all the evidence they could be comfortable knowing that the Commonwealth's cooperating witnesses had independent bases of knowledge for their testimonies, uninfluenced by the consideration that they received. The prosecutor concluded that the Commonwealth's overall case gave the jury a basis to find beyond a reasonable doubt that the defendant and codefendant were responsible for the shootings of Francis Stephens and Jose Astacio.

4. Jury deliberations. The jury began deliberations on November 30, 2005. On December 2, 2005, the third day of their deliberations, the jury requested a transcript of Sharod Clark's testimony. The Court responded in writing that production of a transcript with Clark's testimony was not possible. On the next day of deliberations, December 5, 2005, the jury indicated that they were deadlocked. The Court excused the jury for the day and on the following morning gave the jury further instructions and asked them to return to their deliberations. Later that day, the jury inquired whether they might issue a verdict on one of the defendants first and issue a verdict on the other defendant later. The Court informed the jury of its preference that they issue a verdict as to both defendants but that the jury could proceed one defendant at a time. The jury subsequently asked

whether they might be able to see Detective Martel's report of
the questioning of Sylvester Harrison.  The Court responded in
writing that the detective's report was not admitted into
evidence nor could it have been.  On December 7, 2005, the jury
asked for further instruction on the issue of witness
identification, further clarification about collective memory and
"collective consciousness."  The Court restated its instruction
on witness identification to the jury and provided guidance on
the subject of collective memory; the Court informed the jury
that "collective consciousness" was not a legal concept.

5. Verdicts.  On December 9, 2005, the jury unanimously
found the defendant guilty of murder in the first degree, based
on theories of deliberate premeditation and extreme atrocity or
cruelty; guilty of armed assault with intent to murder; and
guilty of unlicensed possession of a firearm.

The jury unanimously found the codefendant not guilty of
murder in the first degree; not guilty of assault and battery by
means of a dangerous weapon; and not guilty of unlicensed
possession of a firearm.

6. Sentencing.  On December 23, 2005, the Court sentenced
the defendant to a term of life imprisonment without the
possibility of parole on the murder conviction; a term of from
three to five years on the unlicensed firearm conviction to be
served concurrent with the life sentence; and a term of six to

-84-

eight years on the assault with intent to murder conviction to be served from and after the other two sentences.

EVIDENTIARY HEARING

In May 2008, the defendant filed a motion for a new trial, claiming constitutionally ineffective assistance of trial counsel (Def.'s Mot.), with a supporting memorandum of law (Mem. Law Supp. Def.'s Mot.) and affidavit from postconviction counsel (Sultan Aff.).  The Commonwealth filed its opposition in July 2008 (Commonwealth's Opp. to Def.'s Mot.), and the defendant filed a reply in August (Def.'s Reply to Commonwealth's Opp. to Def.'s Mot.).  Upon consideration of the postconviction filings and the Court's knowledge of the trial proceedings, the Court found that the defendant's motion and affidavit raised a "substantial issue," and therefore the Court granted the defendant's request for an evidentiary hearing on his motion (Def.'s Mot. at 2).  See Mass. R. Crim. P. 30(c)(3), 435 Mass. 1502; see generally Commonwealth v. Stewart, 383 Mass. 253, 257-258 (1981).  The affidavit from defendant's postconviction counsel stated that trial counsel had "declined to execute" an affidavit with respect to errors which, "in hindsight, [trial counsel] believe[d]" were made in the representation of the defendant, but that the trial counsel "would be willing" to testify at an evidentiary hearing with respect to those errors.

-85-

(Sultan Aff. at par. 4.)   The defendant requested a hearing at
which trial counsel could be questioned whether any of those
errors were strategic decisions.   (Mem. Law Supp. Def.'s Mot. at
41.)   A defendant's claim that prior counsel provided ineffective
assistance raises a "serious issue" that, if adequately shown,
requires an evidentiary hearing.   Commonwealth v. Licata, 412
Mass. 654, 660-661 (1992).   The defendant made an adequate
showing here.   In addition, largely to allow the defendant to
adduce further testimony with respect to disputed facts
underlying some of his claims, the Court provided the defendant
an opportunity at the evidentiary hearing to present, in effect,
the motion to suppress that he asserts should have been pursued.

The Court held the evidentiary hearing on September 12,
2008.   Postconviction counsel first called the defendant's trial
counsel, Attorney Elda James, who testified to the following.
She had practiced law for twenty-four years.   As of 2005, the
year of the defendant's trial, she had previously tried three
murder cases and had handled a number of others that resulted in
pleas.   She was appointed to represent the defendant.

With respect to this case, she received discovery from the
Commonwealth which included police reports, witness statements,
and grand jury transcripts.   A protective order had entered,
pursuant to which the defendant was prevented from having copies
of police reports, witness statements, and grand jury testimony.

-86-

Based on that discovery, the only alleged eyewitness to the shootings other than the participants was Sylvester Harrison.

On the evening of the homicide, Officer Carroll, one of the officers who responded to the shootings, spoke to a man who refused to identify himself. Officer Carroll's initial report contained no description of the perpetrators. In a February 2001 report, Officer Carroll indicated that he had determined that the unidentified man was Harrison, and Harrison was subsequently interviewed by Detectives Martel and Primm. Trial counsel did not recall the specifics of Detective Martel's February 13, 20001, report but adopted its contents as her knowledge of the report's specifics at the time of discovery. Detective Martel's report indicated: that Harrison saw the perpetrators for a second or two; that Harrison had selected two photographs, including one depicting the defendant, from an array; and that Harrison identified the defendant's photograph as that of the driver of the car involved in the shootings and as that of the individual who had gotten out of the car and shot the victims. Before trial, trial counsel also had a copy of Harrison's March 31, 2004, grand jury testimony. At the grand jury, Harrison testified: that he did not see anyone get out of the car or shoot anyone; that he only selected photographs from the array because the police pressured him to do so and that he picked the photographs at random; that he did not see the face of the

shooter; and that he was drunk at the time of the interview with the two police officers.  Based on all the pretrial discovery, trial counsel was also aware that Harrison had been in a moving vehicle during the shooting incident; that the incident had occurred at night; that he was shown the photographic array five months after the incident; and that all the photographs in the array depicted alleged members of the Franklin Hill Giants.

She was aware of the law to the general effect that impermissibly suggestive identifications are "per se" inadmissible in Massachusetts and that inherently unreliable evidence is inadmissible in court.

About a month before trial, on October 12, 2005, trial counsel filed a motion for a voir dire of Harrison.  That motion was not acted upon, and she did not renew it at the time of Harrison's testimony.  Her thought when she filed the motion was that she was unsure of what Harrison would say on the stand; she was concerned about his testimony going back and forth.  She did not know what else he might say.  Her concern was not so much the reliability of his identification but more generally whether he would say something that would really hurt the defendant as opposed to helping him.  Among other things, she was particularly concerned whether he had an independent source to identify the defendant apart from the photographic array.  She did not renew her motion at the time of trial because she believed that it was

not important.  She believes that Harrison's grand jury testimony
was consistent with what he said at trial.  She acknowledged that
Harrison had testified at trial that police told him that the
photographs in the array were all members of a gang.  That was
the first time that she had heard that police had referred to the
individuals in the array as a gang; she did not believe that it
was anywhere in the discovery.  She thought "that it might have
suggested to Mr. Harrison that these were bad kids and, perhaps,
put some pressure on him to pick out somebody because they were
members of a gang whether or not they were members of a gang."

     She was familiar with <u>Commonwealth</u> v. <u>Daye</u>, and understood
that case to be the law in Massachusetts at the time of trial
with respect to the situation where a witness denies at trial
having made a pretrial identification to the police.  In this
trial, Harrison testified before Detective Martel.  When
Detective Martel was asked about what Harrison had said, trial
counsel objected, and there was a sidebar conference.  During the
conference, the Court brought up the Supreme Judicial Court's
then recent decision in <u>Commonwealth</u> v. <u>Cong Duc Le</u> that
overruled part of <u>Commonwealth</u> v. <u>Daye</u>.  Trial counsel remembered
the Court's sidebar ruling that permitted "very incisive
examination" to the effect that Harrison, on that occasion,
identified those two photographs as just the people that he saw
involved in the Harlem and Glenway Street incident but not any

more than that.  She agreed that Detective Martel's testimony

went somewhat further than that, when he testified to being told

by Harrison that Harrison saw the person identified as the

defendant operating a black Toyota and that Harrison had observed

that person as the shooter, coming out of the vehicle and

shooting at two individuals on the sidewalk.  There was no

objection or motion to strike; trial counsel understood the

Court's ruling to have permitted that portion of Detective

Martel's testimony.  Trial counsel agreed that Detective Martel's

testimony did not help the defendant to the extent that it did

help the Commonwealth.  She noted that other people had testified

at trial about who the driver of the black Toyota was but agreed

that those witnesses were all cooperating witnesses.  She agreed

that there was no testimony at trial that Harrison had identified

the photograph depicting the codefendant and in fact that

Harrison had picked out someone else entirely; she acknowledged

that the codefendant was acquitted of all charges.

     In her closing argument, trial counsel addressed what

Harrison had said about his out-of-court identification and

attacked its reliability, including several factors as to why

that identification should not be credited beyond a reasonable

doubt.  She said that her closing was not simply "damage control"

with respect to Detective Martel's testimony but also was an

attempt to demonstrate to the jury the improper and unlawful

-90-

police tactics and the shoddy police work that had been done in the case.

She recalled that the jury deliberated for about a week in this case and, at one point, reported that it was deadlocked. She remembered that during deliberations on December 6, 2005, the jury asked to see Detective Martel's report of his interview with Harrison and, the following day, asked for further clarification on the issue of witness identification. She also recalled that on December 8, 2005, she asked the Court to give a supplemental instruction on identification focusing on the circumstances which may have influenced Harrison's selection of the photograph. In hindsight, trial counsel thought that the defendant would have had a better chance of acquittal, if all the evidence of Harrison's out-of-court identification had been excluded from trial. She also acknowledged in hindsight that, considering the jury's apparent interest during deliberations in the identification evidence, filing a successful motion to suppress would have led to a better result for the defendant.

At different times during her representation of the defendant, trial counsel considered filing a motion to suppress. However, she did not believe that the composition of the array was unduly suggestive and emphasized that she did not know before trial that police had allegedly told Harrison that all of the photographs in the array depicted gang members. She pointed out

that the array showed all black males of about the same age and that nothing particularly made the defendant "stand out from the crowd." Instead, trial counsel was more interested in Harrison's account as evidence of an improper and inadequate police investigation, along with the absence of forensic evidence implicating the defendant and the failure to follow up on leads provided to police by witnesses at the scene that Hispanics were in the car. She acknowledged that she could have pursued those arguments at trial irrespective of whether she had filed a motion to suppress the identification evidence. In part, she did not file that motion because she did not think that there were legal grounds for filing one.

Trial counsel testified that she did not object when the assistant district attorney in his closing argument said that Harrison had gotten a good look at the shooter. In her view, that statement was supported by the evidence, although she did not think that anyone at trial said that Harrison had gotten a good look at the shooter. With respect to the prosecutor's closing statement, "Mr. Harrison tells us it looks like, the face looked like that of [the defendant]," she testified that she did not think that Harrison had said that at trial. She stated that she had no tactical reason not to object to those statements during the prosecutor's closing argument or to request a corrective instruction after closing arguments.

Trial counsel testified that the discovery that she received included a report by Detective Devane as to his interview with Terrence Dotson on October 9, 2000.  She recalled that, according to that report, Dotson told the detective that Daryl Green shot Francis Stephens in the chest and that Reggie Green "finished" Stephens.  She knew that Daryl and Reggie Green were brothers of Richard Green, who had been shot earlier the same day that Stephens was shot.  She also recalled that, according to the detective's report: Dotson initially related that he knew that information from being involved in a conversation with Richard and Reggie Green; Dotson later said that actually he had overheard a conversation between Richard and Reggie Green; and later still, Dotson denied that he had heard any conversation and recanted his statement about who committed the crime.  At trial, when asked about his reported statement to Detective Devane on trial counsel's cross-examination, Dotson answered "that's what I heard."  Trial counsel agreed at the evidentiary hearing that she had not asked Dotson about his statements to the detective that Dotson had heard that information directly from Richard and Reggie Green.  She also agreed that, after the assistant district attorney elicited on redirect examination that Dotson was just passing on a rumor, she did not ask Dotson about his earlier statements to the effect that he had heard that information directly from the Green brothers.  She could not recall any

-93-

particular strategic reason not to pursue Dotson on that
questioning.

She recalled that, in cross-examining Detective Devane later
at trial, she again brought up Dotson's statement to the
detective that Reggie and Daryl Green had done the shooting.  She
acknowledged that, after the assistant district attorney elicited
on redirect examination of Detective Devane that Dotson said it
was something that he had heard and then recanted having heard it
at all, she did not further examine the detective to the effect
that Dotson had heard from the Green brothers themselves that
Reggie and Daryl Green had done the shooting.  She agreed that
the jury never heard that Richard and Reggie Green were the
source of Dotson's information that Reggie and Daryl Green had
shot Francis Stephens.  When asked if she had a tactical reason
not to elicit that information, she pointed out that it was
important to know when to stop in cross-examination in a
situation like that one, where there was hearsay upon hearsay and
ultimately retraction of that hearsay by the witness.  She
believed that the testimony that could help the defendant was
that Reggie and Daryl Green had done the shooting.  She did not
believe that it was important for the jury also to hear the
source of Dotson's statement about who had committed the shooting
if Dotson had retracted that statement.  She felt at that moment
in her cross-examination that she had elicited what she wanted

from the witness.

The Commonwealth asked no questions of the defendant's trial counsel.

In response to questions from the Court, trial counsel testified to the following. She discussed with the defendant the "pros and cons" of filing a motion to suppress. She testified that he relied to a great deal on her judgment, although he also contributed "quite a bit" in his writings and during visits at jail. She described him as extremely polite, cooperative, and highly intelligent. Trial counsel testified that the defendant agreed to do what she thought was best regarding whether to file a motion to suppress; when she recommended to him that such a motion not be filed, he accepted that recommendation.

The Commonwealth called Detective Martel[6] as the next witness; he testified to the following. He had worked for the Boston police department for nearly thirty-five years and retired on disability on July 31, 2008. He was involved in the investigation into the death of Francis Stephens, and, during the course of that investigation, contacted Sylvester Harrison. They arranged by telephone to meet at 9:30 P.M. on February 13, 2001. Harrison lived at 8 Fowler Street, and Detectives Martel and Primm interviewed him at his home. During that interview,

---

[6]For purposes of consistency in this decision, the Court refers to retired Detective John Martel as "Detective Martel."

Detective Martel showed Harrison a photographic array (trial exhibit 35), which included a photograph of the defendant. Detective Martel told Harrison that the detectives had brought an array of twelve photographs of young men and that, if Harrison recognized anyone, "even if he knew them personally or if he knew them as having participated in the [homicide] event," that he should let the detectives know.

Detective Martel described Harrison's demeanor during the interview as "fine" and said that Harrison spoke in a normal tone of voice, although he was "kind of apprehensive about some of the stuff."

Detective Martel made a report of the interview.  Harrison selected photographs from the array that looked like persons involved in the shooting death of Francis Stephens; one of those photographs depicted the defendant.  Harrison also described his observations during the shooting of the actions of the person who looked like the shooter and of the actions of the second person involved in the shooting.

The only other contact that Detective Martel had with Harrison was at the grand jury.  The detective was also involved in efforts to subpoena Harrison to appear before the grand jury. Harrison did not want to appear before the grand jury.

Both the photographic array that Detective Martel prepared and the manner in which that array was displayed to Harrison

conformed with Boston police department policy or requirements at
that time.  Detective Martel put together the array.

In response to questions from the Court, Detective Martel
testified to the following.  Harrison picked two people out of
the array.  Harrison said that the person depicted in photograph
number two was the driver of a black Toyota and that that person
got out of the car with what Harrison believed was a "TEC-9" and
shot an individual who was wearing clothing similar to what
Harrison's cousin was wearing that evening.  Harrison then said
that photograph number four depicted the passenger of the vehicle
and that that person got out of the car but did not participate
in the shooting.  Harrison said that, after the shooting, both
individuals jumped into the same vehicle and drove down Fowler
Street, where they then got out of the car and into a waiting
vehicle.

On cross-examination by postconviction counsel, Detective
Martel testified to the following.  Detective Martel actually
remembered meeting with Harrison in February 2001.  Prior to that
meeting, Detective Martel did have a general understanding that
police were not permitted: to suggest whom an identification
witness should select, to pressure or coerce identification
witnesses into picking a photograph, or to ask a identification
witnesses to guess in the selection of a photograph.

Detective Martel has testified many times in court,

including in murder cases, about the results of showing a photographic array to a witness.  He was not aware of his sworn testimony ever having been found by a Superior Court judge to be false.  Detective Martel testified that he had never read the March 5, 2002, Memorandum of Decision and Order in Commonwealth vs. Kareem Tyler, Suffolk Superior Court Nos. 96-10622, 96-10985, in which Judge Volterra wrote that "Detective Martel's testimony was a gross distortion of the tape-recorded record" with respect to what had occurred during a witness's identification.

Detective Martel brought the photographic array (trial exhibit 35) when he went to meet with Harrison on February 13, 2001.  Detective Martel had assembled that array using photographs of people whom the police believed to be associated with the Franklin Hill Giants.  Detective Martel could not remember why the meeting was not tape recorded.  He destroyed his notes of the interview after reducing his notes to a report.  The meeting lasted about half an hour.  Harrison had not yet come home from work when the detectives arrived.  Detective Martel testified that, when he showed the array to Harrison, the detective did not tell Harrison that the photographs depicted members of a gang.  Detective Martel did not have any reason to know that Harrison himself knew that the photographs in the array depicted members of a gang.  Detective Martel denied being told by Harrison that Harrison not seen the shooters and denied that

-98-

Harrison had resisted picking out any photographs.  Detective
Martel denied that he pressed Harrison by asking him, if it were
someone in the array, who would it be.  Harrison selected
photograph number four of Omar Greene and photograph number two
of the defendant.  Detective Martel did not know why he did not
have Harrison initial, circle, or otherwise mark the photographs
selected.

In response to questions from the Court, Detective Martel
testified to the following.  Because Harrison got out of work at
around 9:00 P.M., the interview was scheduled at his home for
9:30 P.M.  During the interview, Harrison did not appear to be
under the influence of any narcotics or alcohol.  Harrison was
apprehensive with "the fear of any normal citizen that would have
to testify against somebody in a homicide" case and who lived in
the neighborhood where the homicide occurred.  Harrison's home
was about a two minute walk from the scene of the homicide;
Harrison's relatives lived in the same building as Harrison.

Detective Martel denied coaxing Harrison into making an
identification by asking if he knew someone in the array and then
repeatedly asking, "if, if, if."  Detective Martel asked Harrison
just to let the detectives know if he recognized anyone from the
array, whether as a neighbor, as somebody he had seen elsewhere,
or as a person involved in the shooting.  Harrison did not say
that he did not recognize anybody well enough to make a

selection.

Detective Martel drew the conclusion that Harrison did not want to appear before the grand jury from observing Harrison's nervousness on the day that he appeared before the grand jury.

Detective Martel has testified in court in "[h]undreds" of cases, approximately fifty of which were homicides.  He worked in the homicide unit from September 1995 until 2001.

On recross-examination by postconviction counsel, Detective Martel testified to the following.  Harrison had volunteered information to the police on the night of the incident, although he refused to identify himself.  When Harrison was later identified, he agreed to meet with police.  Detective Martel did not recall Harrison's grand jury testimony disclaiming any identification or suggesting intimidation; Detective Martel was not present when Harrison testified.

The Commonwealth next called Detective Primm, who testified to the following.  At the time of the hearing, he had been on the Boston police force for twenty-nine years and, during that time, had spent ten years in the homicide unit.  In 2000, Detective Primm worked with Detectives Martel and Wyse on the investigation into the shooting death of Francis Stephens.  Detective Primm participated with Detective Martel in the interview of Harrison during which Detective Martel showed Harrison a photographic array.  Harrison picked out two people from the array.  During

-100-

the interview, Harrison was sober.  Detective Primm did not write

a report with respect to that interview.  Detective Primm did not

recall that Harrison had indicated that he could not make an

identification or that Harrison was reluctant to make an

identification.

On cross-examination by postconviction counsel, Detective

Primm testified to the following.  Detective Primm actually

remembered the meeting with Harrison because of the brutality of

the murder.  Detective Primm did not remember anything about the

meeting that was not included in Detective Martel's report.

Detective Primm remembered everything in Detective Martel's

report except the initial involvement with Officer Carroll and

that Harrison had said that his two children were in the car with

him.  Detective Primm independently remembered Harrison saying

the things attributed to him in paragraphs six and seven of the

report.  Detective Primm recalled that the interview occurred in

Harrison's kitchen and that, when shown the array, he was asked

to identify anyone he could identify.

Detective Primm testified that there was no specific reason

why a tape recorder was not used to record Harrison's interview

but that tape recorders may turn away some witnesses.  Detective

Primm may have taken notes during the interview but did not know

of any notes that were in existence at the time of the hearing.

Detective Primm explained that the absence of a circle around or

a mark next to any of the arrayed photographs would indicate that
Harrison was not completely positive of his identification;
Detective Primm believed that is why Harrison was not asked to
circle or mark any photographs.  Detective Primm did not recall
whether Harrison was asked to indicate the photographs that he
had selected.

In response to questions from the Court, Detective Primm
testified to the following.  As a matter of police policy, he
would not ask a drunk or intoxicated person to make an
identification.  Harrison was cooperative, but like most
witnesses, not comfortable with the situation in which he had
been placed.  Detective Primm had spent approximately ten years
in the drug unit and said that Harrison was not under the
influence of drugs or alcohol during the interview.  Detective
Primm did not recall Detective Martel pressuring Harrison to make
an identification by, for example, repeatedly asking Harrison, if
he had to identify someone, whom would he choose.  Detective
Primm did not think that Detective Martel said to Harrison that
all of the people depicted in the array are members of the
Franklin Hill Giants.

On recross-examination by postconviction counsel, Detective
Primm testified to the following.  He would not ask a witness,
who is drunk or obviously under the influence of drugs, to make
an identification in a murder investigation, although the

detective might talk with an intoxicated percipient witness at the scene of a homicide that just occurred and then follow up later when the witness is sober.

## DISCUSSION

Currently before the Court is the defendant's motion for a new trial under Mass. R. Crim. P. 30(b).[7]  (Def.'s Mot.)  In support of that motion the defendant maintains that each of four errors by his trial counsel denied him effective assistance, in violation of his rights under art. 12 of the Massachusetts Declaration of Rights and the Sixth and Fourteenth Amendments to the United States Constitution.[8]  (Mem. Law Supp. Def.'s Mot. at

---

[7]Although the defendant also cites Mass. R. Crim. P. 30(a), he seeks only a new trial (see Def.'s Mot. at 1), "as would characterize a motion under Mass. R. Crim. P. 30(b)," Commonwealth v. Simmons, 448 Mass. 687, 691 (2007).  See generally Reporter's Notes to Mass. R. Crim. P. 30, 47 Mass. Gen. Laws Ann., Rules of Criminal Procedure, at 754-757 (Thomson/West 2006).  The Court treats the motion as made under Rule 30(b). Cf., e.g., Commonwealth v. Simmons, 448 Mass. at 691.  See Commonwealth v. Preston, 393 Mass. 318, 322-323 (1984) ("[P]leadings are to be treated according to their nature and substance rather than their technical form" [quotation omitted].); accord Commonwealth v. Pring-Wilson, 448 Mass. 718, 731-732 (2007).

[8]The Court has not overlooked that the defendant's motion also adverts to the Fifth Amendment to the United States Constitution (Def.'s Mot. at 1); the defendant's supporting memorandum omits any apparent claim for relief under the Fifth Amendment.  "On a motion for a new trial, the burden of establishing the grounds for a new trial rests on the defendant," Commonwealth v. Hudson, 446 Mass. 709, 714-715 (2006), including "[w]here a new trial is sought based on a claim of ineffective assistance of counsel," Commonwealth v. Montez, 450 Mass. 736,

2.)  The defendant asserts that his trial counsel: failed to move
to suppress an out-of-court identification of the defendant,
failed to object to inadmissible hearsay, failed to object to
misstatements of the evidence in the prosecutor's closing
argument, and failed to introduce evidence of a third party
confession.  (Id. at 17-40.)  The defendant argues that those
errors were prejudicial and thus warrant a new trial.  (Id. at 2,
42.)  For the reasons stated herein, the Court determines that
the defendant has not met his burden of proving his entitlement
to a new trial.  The defendant's motion is therefore denied.

    1. Standards of review.  The Massachusetts Rules of Criminal
Procedure provide that "[t]he trial judge upon motion in writing
may grant a new trial at any time if it appears that justice may
not have been done," Mass. R. Crim. P. 30(b), as appearing in 435
Mass. 1501 (2001), and "[i]n the absence of constitutional error,
the granting of a motion for a new trial is addressed to the
sound discretion of the trial judge," Commonwealth v. Smith, 381
Mass. 141, 142 (1980); accord Commonwealth v. Cintron, 435 Mass.
509, 517 (2001).  However, "the judge has no discretion to deny a

---

755 (2008), or "to rebut the presumption that [the defendant] had
a fair trial," Commonwealth v. Comita, 441 Mass. 86, 93 (2004).
    In all events, "[w]hat constitutes the 'basic elements' of a
fair trial under the Fifth Amendment is determined 'largely
through the several provisions of the Sixth Amendment,'" United
States v. DeCologero, 530 F.3d 36, 73 (1st Cir. 2008), quoting
Strickland v. Washington, 466 U.S. 668, 685 (1984), pursuant to
which the defendant does claim that he is entitled to relief.

new trial" if "the original trial was infected with prejudicial
constitutional error," Earl v. Commonwealth, 356 Mass. 181, 184
(1969); accord Commonwealth v. Dubois, 451 Mass. 20, 30 (2008),
such as where prior counsel provided ineffective assistance, see
Commonwealth v. Cook, 380 Mass. 314, 320-321 (1980); Commonwealth
v. Wheeler, 52 Mass. App. Ct. 631, 635-636 (2001).

"The standard for a claim of ineffective assistance of
counsel is set forth in Commonwealth v. Saferian, 366 Mass. 89,
93-98 (1974)[Saferian]." Commonwealth v. Sanders, 451 Mass. 290,
308 (2008).[9] The Saferian test "require[s] . . . a discerning
examination and appraisal of the specific circumstances of the
given case to see whether there has been serious incompetency,
inefficiency, or inattention of counsel--behavior of counsel
falling measurably below that which might be expected from an
ordinary fallible lawyer--and, if that is found, then, typically,
whether it has likely deprived the defendant of an otherwise
available, substantial ground of defence." Commonwealth v.

---

[9]The defendant argues that he was deprived of his rights
under both the State and Federal Constitutions, but the Court
"need only evaluate trial counsel's performance under the State
constitutional standards set forth in Saferian, 366 Mass. 89, 96
(1974), because, 'if the Saferian test is met, the Federal test
[see Strickland v. Washington, 466 U.S. 668, 687 (1984)] is
necessarily met as well'" (alteration in original). Commonwealth
v. Licata, 412 Mass. 654, 661 n.10 (1992), quoting Commonwealth
v. Fuller, 394 Mass. 251, 256 n. 3 (1985); see Commonwealth v.
Urena, 417 Mass. 692, 696 (1994). See also Stephens v. Hall, 294
F.3d 210, 214-215 (1st Cir. 2002), and cases cited; Malone v.
Clarke, 536 F.3d 54, 63 & n.7 (1st Cir. 2008).

Saferian, 366 Mass. at 96; accord Commonwealth v. Montez, 450

Mass. 736, 754 (2008).  "The burden is on the defendant to meet

both prongs of the test." Commonwealth v. Peloquin, 437 Mass.

204, 210 (2002); cf. Commonwealth v. Ogden O., 448 Mass. 798, 806

(2007).

    2. Failure to file motion to suppress.  The defendant has

not demonstrated that his trial counsel deprived him of

constitutionally effective assistance by failing to move to

suppress Sylvester Harrison's identification of the defendant

from the photographic array assembled by Detective Martel (Mem.

Law Supp. Def.'s Mot. at 17-30).  Defense counsel may make a

tactical or strategic decision not to file a motion to suppress,

e.g., Commonwealth v. Moffet, 383 Mass. 201, 214 & n.7 (1981);

Commonwealth v. Tevlin, 433 Mass. 305, 316-317 (2001);

Commonwealth v. Clemente, 452 Mass. 295, 327 (2008), and the

Court accepts the evidentiary hearing testimony of the

defendant's trial counsel that she decided to forgo a motion to

suppress Harrison's identification for tactical reasons (tr. Sep.

12, 2008, at 34-37).  While such a "decision is not, for that

reason, immune from scrutiny," Commonwealth v. Adams, 374 Mass.

722, 729 (1978); accord Commonwealth v. Licciardi, 387 Mass. 670,

672 (1982); Commonwealth v. Hernandez, 63 Mass. App. Ct. 426, 432

(2005), "[a]n attorney's tactical decision amounts to ineffective

assistance of counsel only if it was manifestly unreasonable when

made," Commonwealth v. Martin, 427 Mass. 816, 822 (1998), citing

Commonwealth v. Roberts, 423 Mass. 17, 20 (1996), and

Commonwealth v. Adams, 374 Mass. at 728; accord Commonwealth v.

Clemente, 452 Mass. at 326-327.  Trial counsel testified at the

evidentiary hearing that she based her decision not to file a

suppression motion on the perceived absence of legal support for

suppressing the identification and on the possible benefit to her

overall trial theory of police misconduct from expounding on the

alleged improprieties in the identification procedure.  (Tr. Sep.

12, 2008, at 34-37.)  The defendant has not established that

trial counsel's decision was manifestly unreasonable when made.

Trial counsel testified that she primarily based her

decision not to file a motion to suppress the identification

evidence on the apparent futility of such a motion.  (Id. at 36-

37.)  The issue presented to the Court therefore largely resolves

to a determination of the "likelihood that the motion to suppress

would have been successful," Commonwealth v. Comita, 441 Mass.

86, 91 (2004); accord Commonwealth v. Montez, 450 Mass. at 756.

In order to suppress a photographic identification, the

defendant must "show, by a preponderance of the evidence, that

considering the totality of the circumstances attending it, the

identification was so impermissibly or unnecessarily suggestive

and conducive to irreparable misidentification as to deprive the

defendant of his due process rights" (footnote omitted.

Commonwealth v. Thornley, 406 Mass. 96, 98 (1989), citing

Commonwealth v. Botelho, 369 Mass. 860, 866-868 (1976), and

Simmons v. United States, 390 U.S. 377, 384 (1968); accord

Commonwealth v. Payne, 426 Mass. 692, 694 (1998); see

Commonwealth v. DeLong, 72 Mass. App. Ct. 42, 50-51 (2008).   If

the defendant makes that showing, evidence of the identification

is "per se" excluded from trial under the due process clause of

art. 12 of the Massachusetts Declaration of Rights.   See

Commonwealth v. Odware, 429 Mass. 231, 235 (1999), citing

Commonwealth v. Johnson, 420 Mass. 458, 462-465 (1995), and

Commonwealth v. Botelho, 369 Mass. at 865-869; see also

Commonwealth v. Martin, 447 Mass. 274, 294-295 (2006) (Cordy, J.,

dissenting).

Before turning to the defendant's arguments, the Court

observes as a threshold matter that "[t]he defendant's photograph

does not stand out as distinctive in any unnecessarily suggestive

way," Commonwealth v. Montez, 450 Mass. at 756, and the Court

finds nothing about the photographs assembled in the array that

"might have the effect of singling out the accused," United

States v. Ash, 413 U.S. 300, 333 (1973) (Brennan, J., dissenting)

(discussing possible sources of suggestion in photographic

arrays).   Indeed, the defendant does not argue that there was

impropriety about any aspect of the identification procedure such

that his photograph was "in some way emphasized," Simmons v.

United States, 390 U.S. at 383; Commonwealth v. Paszko, 391 Mass. 164, 169 (1984).[10]  Trial counsel testified at the evidentiary hearing that the array was not improperly composed of black males who all appeared to be of similar age (tr. Sep. 12, 2008, at 34-35), and the defendant has not argued to the contrary.  With the exception noted in the margin, the array assembled by Detective Martel is similar to that regarded as acceptable in, e.g., Commonwealth v. Jones, 375 Mass. 349, 355 (1978).[11]

The defendant's multiple arguments that the identification procedure used with Harrison was nevertheless impermissibly suggestive and thus violative of the due process clause of art. 12 (Mem. Law Supp. Def.'s Mot. at 22-27) are unpersuasive. First, based on the credible evidence offered at the evidentiary

---

[10]The defendant implicitly acknowledges that Detectives Martel and Primm did not suggest to Sylvester Harrison any particular photograph: "Under the circumstances, the identification procedures employed here were no better than throwing a dart at a dartboard . . . ." (Mem. Law Supp. Def.'s Mot. at 22).

[11]The testimony of several witnesses that Akia Cheshire's photograph was one of the twelve photographs in the array appears to have gone unnoticed by the defendant and the Commonwealth. Those witnesses included Cheshire's sister, Natasha Flowers (tr. Nov. 21, 2005, at 78-79), and Cheshire's sister-in-law, Lakevia Mays (tr. Nov. 17, 2005, at 240).  The matter was not explored with Detective Martel at trial or at the evidentiary hearing, and neither the defendant nor the Commonwealth addresses it in their respective legal memoranda.  Regardless, the mere fact that a woman's photograph is included among eleven photographs of men would seem to be without appreciable legal significance to a male defendant's due process rights: an eleven photograph array is not improper, Commonwealth v. Otsuki, 411 Mass. 218, 233 (1991).

hearing as well as the Court's "knowledge of what occurred at trial," Commonwealth v. Kirwan, 448 Mass. 304, 315 (2007); accord Commonwealth v. DeJesus, 71 Mass. App. Ct. 799, 811 (2008); see also Commonwealth v. Croken, 432 Mass. 266, 271 (2000), quoting Commonwealth v. Carver, 33 Mass. App. Ct. 378, 381 (1992) ("[T]he motion judge, who had been the trial judge, 'was entitled to use his knowledge and evaluation of the evidence at trial' in deciding the merits of the motion."), the Court finds that the defendant has not met his burden to prove the factually disputed claims: that Detective Martel pressured Harrison to make selections from the photographic array (Mem. Law Supp. Def.'s Mot. at 24-26); that Detective Martel told Harrison that the photographic array depicted members of a gang (id. at 26-27); or that Harrison was intoxicated during the identification procedure (id. at 27).  See Commonwealth v. Comita, 441 Mass. at 93, quoting Commonwealth v. Bernier, 359 Mass. 13, 15 (1971), and citing Commonwealth v. Schlieff, 5 Mass. App. Ct. 665, 669 (1977) ("[T]he burden is on the defendant to prove facts that are 'neither agreed upon nor apparent on the face of the record.'").[12,13]  The remainder of defendant's arguments (Mem. Law

------------------------------------------------

[12]At any rate, courts have found that a witness's perceived pressure by police to make an identification and a witness's intoxication during an identification procedure to be factors pertinent to the question of reliability and not impermissible suggestiveness: see, e.g., Commonwealth v. Bonnoyer, 25 Mass. App. Ct. 444, 448 & n.2 (1988) (perceived pressure), and see, e.g., State v. Jackson, 73 Conn. App. 338, 382 (2002)

Supp. Mot. at 23-27) miss the mark: whether Harrison's

identification was unreliable or inaccurate based on aspects of

the identification unrelated to any improperly suggestive police

---

(intoxication).

[13]The defendant's claim that Detective Martel told Sylvester
Harrison that the photographs in the array depicted members of a
gang (Mem. Law Supp. Def.'s Mot. at 26-27) arises from Harrison's
testimony at trial (see id. at 6, citing trial testimony; and
compare ex. 3 to Mem. Supp. Def.'s Mot. [Harrison trial
testimony] with: ex. 6 to Mem. Supp. Def.'s Mot. [Harrison grand
jury testimony], ex. 2 to Commonwealth's Opp. to Def.'s Mot.
[Detective Martel report], and ex. 3 to Commonwealth's Opp. to
Def.'s Mot. [Detective Martel grand jury testimony]), as trial
counsel testified at the evidentiary hearing (see tr. Sep. 12,
2008, at 21-22, 34), and thus cannot, in any event, properly
support an argument that counsel was ineffective for not filing a
pretrial motion to suppress.  See, e.g., Commonwealth v.
Fenton F., 442 Mass. 31, 37-38 (2004), quoting Strickland v.
Washington, 466 U.S. 668, 689 (1984) ("[E]very effort [must] be
made to eliminate the distorting effects of hindsight . . . and
to evaluate the conduct from counsel's perspective at the time"
[second alteration in original] [omission in original].); Phoenix
v. Matensanz, 233 F.3d 77, 81-82 (1st Cir. 2000) ("Specifically,
a court must judge the reasonableness of counsel's challenged
conduct on the facts of the case at the time of that conduct.").
Cf. Commonwealth v. Rivera, 441 Mass. 358, 367 (2004), quoting
Commonwealth v. Ramos, 402 Mass. 209, 216 (1988) ("Evidence
adduced at trial but not before the motion judge . . . cannot be
determinative of the propriety of the motion judge's decision"
[omission in original].); Commonwealth v. Martin, 447 Mass. 274,
280 n.5 (2006).
     Even assuming that Detective Martel did in effect convey to
Harrison "that every person in the photo[graphic] array was a
potential suspect" (Mem. Law Supp. Def.'s Mot. at 26), the
detective would have been doing little more than "simply stating
the obvious purpose of showing the array of photographs to the
witness," Commonwealth v. Melvin, 399 Mass. 201, 206 n.9 (1987);
see also Commonwealth v. Cincotta, 379 Mass. 391, 393-394 (1979);
Commonwealth v. Ayles, 31 Mass. App. Ct. 514, 517-518 (1991).  "A
witness ordinarily expects to be asked to make an identification
of someone who either fits the description of a suspect or is
suspected to have been involved in the reported crime."
Commonwealth v. Phillips, 452 Mass. 617, 628 (2008).

-111-

conduct is inapposite.  See <u>Commonwealth</u> v. <u>Paszko</u>, 391 Mass. at

172, quoting <u>Commonwealth</u> v. <u>Gordon</u>, 6 Mass. App. Ct. 230, 237

(1978) ("The question raised by a motion to suppress

identification testimony is not whether the witness was or might

be mistaken but whether any possible mistake was or would be the

product of improper suggestions made by the police.");

<u>Commonwealth</u> v. <u>Payne</u>, 426 Mass. at 694 n.3.[14]  "When the

procedures are not suggestive, the pretrial identifications are

admissible without a further showing." <u>Commonwealth</u> v. <u>Warren</u>,

403 Mass. 137, 139 (1988); <u>Commonwealth</u> v. <u>Payne</u>, 426 Mass. at

694 n.3.

The defendant's two alternative suppression arguments may be

---

[14]The extent of Sylvester Harrison's opportunity to view the
perpetrators on September 16, 2000, (see Mem. Law Supp. Def.'s
Mot. at 23) and the length of time between the shootings and
Harrison's identification (see <u>id.</u> at 23-24) are factors of
reliability inapplicable to the question of suggestiveness in an
analysis under art. 12 of the Massachusetts Declaration of
Rights.  See <u>Commonwealth</u> v. <u>Johnson</u>, 420 Mass. 458, 464-465
(1995).  That police could have used another, assertedly more
accurate, method of photographic identification (see Mem. Law
Supp. Def.'s Mot. at 24-26) does not in itself render the
identification method which was used unduly suggestive, see
<u>Commonwealth</u> v. <u>Martin</u>, 447 Mass. 274, 280 (2006); <u>Commonwealth</u>
v. <u>Martinez</u>, 67 Mass. App. Ct. 788, 793 (2006); the Department of
Justice guidelines, on which the defendant partly relies in
challenging the method of simultaneously displaying photographs
(see Mem. Law Supp. Def.'s Mot. at 25), have in fact been used to
illustrate the continued viability of that identification method,
see, e.g., <u>Taylor</u> v. <u>Commonwealth</u>, 52 Va. App. 388, 394 & n.2
(2008).  The tentative nature of Harrison's identification (see
Mem. Law Supp. Def.'s Mot. at 27) "does not disqualify it from
admission, but goes to its weight." <u>Commonwealth</u> v. <u>Sullivan</u>,
436 Mass. 799, 806-807 (2002).

succinctly addressed.  The argument that Harrison's identification is inadmissible under the test adopted in <u>Manson</u> v. <u>Brathwaite</u>, 432 U.S. 98 (1977) (Mem. Law Supp. Def.'s Mot. at 27-28), is unnecessary as a matter of State constitutional law. See <u>Commonwealth</u> v. <u>Johnson</u>, 420 Mass. at 464-472 (rejecting <u>Manson</u> v. <u>Brathwaite</u> reliability test and concluding that "art. 12 requires the application of the stricter per se approach described in <u>Commonwealth</u> v. <u>Botelho</u>, <u>supra</u>"); <u>Commonwealth</u> v. <u>Andrews</u>, 427 Mass. 434, 438 n.2 (1998) (noting that <u>Commonwealth</u> v. <u>Johnson</u>, 420 Mass. at 464-472, "reaffirm[ed] rule of per se exclusion of unnecessarily suggestive identifications as stated in <u>Commonwealth</u> v. <u>Botelho</u>, 369 Mass. 860, 866 [1976], and declin[ed] to adopt as State constitutional standard the 'reliability test' in <u>Manson</u> v. <u>Brathwaite</u>, 432 U.S. 98, 114 [1977], for Federal due process claims"); <u>Commonwealth</u> v. <u>Martin</u>, 447 Mass. at 302 n.16 (Cordy, J., dissenting) (same).  The argument that Harrison's identification is so unreliable as to be inadmissible as a matter of due process (Mem. Law Supp. Def.'s Mot. at 28-29) is problematic without citation to specific authority, but, to the extent that it is made, it is misplaced, see <u>Commonwealth</u> v. <u>Payne</u>, 426 Mass. at 694 n.3, and cases cited (rejecting argument that judge should have suppressed witnesses' pretrial identifications on ground that they were unreliable).

Particularly in light of the facts apparent at the time (see

note 13, supra), trial counsel's decision to forgo filing a
motion to suppress Harrison's identification has not been proven
manifestly unreasonable when made. Although trial counsel
acknowledged at the evidentiary hearing that filing a successful
motion would not have significantly limited her ability at trial
to develop a defense (see tr. Sep. 12, 2008, at 35-36), it is not
manifestly unreasonable, for example, to "determine[] that the
chance of success on a motion to suppress was too slight to
justify the risks of affording the witnesses an opportunity to
rehearse their testimony at a suppression hearing," Commonwealth
v. Drayton, 386 Mass. 39, 42 (1982); cf. Commonwealth v. Serino,
436 Mass. 408, 413 (2002). "If there is little chance of success
on a motion to suppress, defense counsel may well prefer to
examine identifying witnesses in front of the jury, so that those
witnesses would lack any benefit of preparation that might flow
from prior voir dire questioning." Commonwealth v. Moffet, 383
Mass. at 214 n.7. "Where identification evidence has not been
suppressed, its infirmities are a matter for consideration by the
jury," Commonwealth v. Rodriguez, 378 Mass. 296, 308 (1979);
Commonwealth v. Leaster, 395 Mass. 96, 104 (1985), and trial
counsel in this case employed the recognized strategy "to inform
the jury of procedures used which might have been somewhat
suggestive, but also to establish the existence of fairer
procedures which the police chose to ignore," Commonwealth v.

-114-

Rodriguez, 378 Mass. at 308.  See also the discussion in, e.g.,
Commonwealth v. Tevlin, 433 Mass. at 317-318, and Commonwealth v.
Conceicao, 388 Mass. 255, 264-265 (1983).

Moreover, it is significant that the defendant concurred in
the decision not to file the motion to suppress after
consultation with trial counsel (see tr. Sep. 12, 2008, at 49-
50): "Strategic choices reasonably made by counsel with a
defendant's concurrence may not be challenged successfully . . .
on the ground that counsel was ineffective in a constitutional
sense," Commonwealth v. Tevlin, 433 Mass. at 318, quoting
Commonwealth v. Finstein, 426 Mass. 200, 204, (1997).[15]

---

[15]Citing Commonwealth v. Woodberry, 26 Mass. App. Ct. 636,
638-640 (1988), the Commonwealth requested the Court's permission
at any evidentiary hearing held "to discuss the facts and
circumstances surrounding the legal representation provided to
the defendant by [his trial counsel]" and "to inquire into the
specifics of that relationship with and legal representation by
the defendant's trial counsel." (Commonwealth's Opp. to Def.'s
Mot. at 41-42.)  In reply, the defendant objected to granting the
Commonwealth's requested order, arguing that he had not waived
the attorney-client privilege merely by claiming ineffective
assistance of counsel because, in essence, the principal claimed
deficiencies did not involve his communications with his trial
counsel. (Def.'s Reply to Commonwealth's Opp. to Def.'s Mot. at
7-8.)  However, neither the defendant nor the Commonwealth took
the opportunity provided by the Court at the August 8, 2008,
status hearing to present further argument on the issue.
    Largely on the basis of the discussion in Commonwealth v.
Tevlin, 433 Mass. 305, 316-318 (2001), the Court inquired at the
evidentiary hearing into the defendant's "part in [his trial
counsel's] strategic decision," id. at 316.  (See tr. Sep. 12,
2008, at 46-50.)  When a defendant alleges ineffective assistance
of counsel, "the attorney-client privilege may be treated as
waived at least in part," where, as it was here, "the disclosure
is relevant, material, or necessary to defend against the charge"
(quotation omitted), Commonwealth v. Woodberry, 26 Mass. App. Ct.

In sum, especially given the minimal chance of successfully suppressing Harrison's identification, trial counsel's decision to forgo a motion to suppress that identification has not been demonstrated to have deprived the defendant of constitutionally effective assistance.

3. <u>Failure to object to inadmissible hearsay</u>.  The defendant has also not shown that trial counsel deprived him of effective assistance by failing to object to Detective Martel's testimony of certain details of Sylvester Harrison's statement identifying the defendant (Mem. Law Supp. Def.'s Mot. at 30-33).  While the Court finds that one detail in Detective Martel's testimony may have been objectionable, that piece of hearsay testimony was not prejudicial to the defendant, as it was cumulative of other properly admitted evidence.  See, e.g., <u>Commonwealth</u> v. <u>Quincy Q.</u>, 434 Mass. 859, 869 (2001), citing <u>Commonwealth</u> v. <u>Esteves</u>, 429 Mass. 636, 640 (1999) ("[T]he admission of inadmissible hearsay will not constitute prejudicial error if it is merely cumulative of other properly admitted evidence.").  The failure to object to the introduction of cumulative or nonprejudicial evidence does not constitute ineffective

at 637.  See <u>Commonwealth</u> v. <u>Brito</u>, 390 Mass. 112, 119 (1983); see also Mass. R. Prof. C. 1.6, 426 Mass. 1322-1330 (1998).
    The attorney-client privilege does not relieve the defendant of his burden to prove facts that might distinguish his case from that described in <u>Commonwealth</u> v. <u>Tevlin</u>, 433 Mass. at 316.  See, e.g., <u>Commonwealth</u> v. <u>Bannister</u>, 15 Mass. App. Ct. 71, 75 (1983), and materials cited.

assistance.   See, e.g., <u>Commonwealth</u> v. <u>Egardo</u>, 426 Mass. 48, 52-

53 (1997), citing cases; <u>Commonwealth</u> v. <u>Mattos</u>, 49 Mass. App.

Ct. 218, 225 (2000).

   During Detective Martel's trial testimony, the prosecutor

asked him whether Harrison had given the detective "a statement

as to describing a person or persons dong [<u>sic</u>] the shooting at

Harlem and Glenway Street during the evening of September 16,

2000," and the defendant's trial counsel timely objected.   (Tr.

Nov. 15, 2005, at 262.)   At the subsequent sidebar conference,

the Court ruled that the Commonwealth could introduce evidence of

Harrison's identifications through Detective Martel under the

ruling of <u>Commonwealth</u> v. <u>Cong Duc Le</u>, 444 Mass. 431 (2005) (<u>Cong</u>

<u>Duc Le</u>), because Harrison had denied at trial making the prior

identifications.[16]   (Tr. Nov. 15, 2005, at 263-265, 267.)   Upon

_____

   [16]The Court: "I believe that the . . . current case
law . . . is to the effect that even [<u>sic</u>] out of court
identification is expressly disavowed by a witness on the stand
that someone may, that the police officer may testify to that
[identification]. . . . [T]he . . . 2005 decision in Cong Duc Le,
I believe, that that's what that case stands for, is that your
understanding?"
   The prosecutor: "That's correct.   And there's another
footnote in a more recent case that summarizes it that way."
   The Court: "Yes."
   The prosecutor: "Commonwealth v Almonte, footnote [four]
describes the modification of the rule in Commonwealth v Day
[<u>sic</u>] that took place in Commonwealth v, ----"
   The Court: "Well, I think the most that that would permit
would be very incisive examination to the effect that that
witness, Mr. Harrison, on that occasion identified those two
photographs, but not more than that.   Identified them as the two
photograph [<u>sic</u>] as just person [<u>sic</u>] he said that he saw
involved in the Harlem and Glenway Street incident.   I don't

further direct examination, Detective Martel testified that, from

a photographic array assembled by the detective, Harrison had

selected photograph number four, which depicted Omar Greene, and

photograph two, which depicted the defendant.  (Id. at 270-271.)

The following exchange then occurred:

    The prosecutor: "Now with respect to photograph number [two]
did Mr. Harrison describe any actions of that particular
individual in making his identification of him?"
    The witness: "Yes."
    The prosecutor: "What did he say he saw that man doing?"
    The witness: "He observed him operating I believe a black
Toyota.  I think he described it as a black Toyota.  He observed
him as being the shooter coming out of the vehicle and shooting
at the two individuals that were on the sidewalk."
    The prosecutor: "Did he describe Mr. Green[e] as looking
like a person he saw shooting or a person he just saw near the
car?"
    The witness: "Saw in the car, the passenger of the vehicle."

(Id. at 271-272.)  At the evidentiary hearing, trial counsel

testified that she did not object to those questions or move to

strike the answers because she understood the Court's sidebar

conference ruling to have permitted them.[17]  (Tr. Sep. 12, 2008,

––––––––––––––––––––

think any more than that." . . .
    The Court: "[S]o I'm going to let counsel proceed on the
basis of the Cong Duc Le case."

(Tr. Nov. 15, 2005, at 263-265, 267.)

    [17]Postconviction counsel: "Now, you did not object or move
to strike that answer?"
    Trial counsel: "I didn't."
    Postconviction counsel: "Okay.  Was there any particular
tactical reason why you did not object or move to strike that
answer?"
    Trial counsel: "What I understood the ruling of the court to
be that the witness could testify about the two photographs and
the incident on Harlem and whatever that, Glenway.  So I did not

at 27.)

The defendant, acknowledging that Detective Martel permissibly testified to the fact of Harrison's disclaimed identification (Mem. Law Supp. Def.'s Mot. at 30-31), contends that the ruling in Cong Duc Le did not permit the Commonwealth to introduce "clearly inadmissible hearsay" through Detective Martel "that Harrison said that [the defendant] was driving a black Toyota, got out of the car, and shot at two people on the sidewalk" (id. at 31).

In Cong Duc Le, the Supreme Judicial Court overruled the portion of Commonwealth v. Daye, 393 Mass. 55, 60-63 (1984), that limited the use of pretrial identification evidence where the identifying witness denies at trial having made the identification. Commonwealth v. Cong Duc Le, 444 Mass. at 432; see Commonwealth v. Almonte, 444 Mass. 511, 521 n.4 (2005). The Cong Duc Le court therefore found permissible, under the rules of evidence and the State Constitution, the introduction and substantive use of a third party police officer's testimony "regarding the contents of [an identifying witness's] statement

---

understand the court's ruling to be he couldn't say anything about the person being the driver and got out of the black car.
    Postconviction counsel: "That was your understanding of what the judge's ruling was?"
    Trial counsel: "That was my understanding of the judge's ruling."
    Postconviction counsel: "Okay."

(Tr. Sep. 12, 2008, at 27.)

of identification." <u>Commonwealth</u> v. <u>Cong Duc Le</u>, 444 Mass. at
442.   The Supreme Judicial Court did not, however, redefine what
constitutes a statement of identification, but cf. the discussion
in M.S. Brodin & M. Avery, Massachusetts Evidence § 11.1.1, at
613 n.7 (8th ed. 2007), and, at trial, the Court thus read <u>Cong</u>
<u>Duc Le</u> through the lens of existing case law on that issue.

In <u>Commonwealth</u> v. <u>Martinez</u>, the Supreme Judicial Court
considered the scope of permissible trial testimony regarding an
identifying witness's statement of identification that is
introduced through a police officer who observed the
extrajudicial identification.   See 431 Mass. 168, 175-176 (2000).
Addressing the Commonwealth's argument on appeal based on the
"doctrine of verbal completeness," the <u>Martinez</u> court held that
"[f]or the purpose of testimony on extrajudicial identifications,
the verbal completeness doctrine extends only to testimony as to
the identifying witness's identification of the defendant," <u>id</u>.
at 175, and not to testimony of the identifying witness's
"statement, which included [the witness's] description of how
many shots were fired, the color of the gun, and the defendant's
behavior after the murder," <u>id</u>.; accord M.S. Brodin & M. Avery,
Massachusetts Evidence § 1.7 at 21 (8th ed. 2007) ("[T]he verbal
completeness doctrine extends only to testimony as to the
identification of the defendant and not to matters such as a
description of the crime or subsequent events.").

In this case, where the purpose of Detective Martel's photographic array was to assist police in identifying the shooter or shooters of Francis Stephens and Jose Astacio, "testimony as to the identifying witness's identification of the defendant," Commonwealth v. Martinez, 431 Mass. at 175, encompassed Detective Martel's testimony both that Harrison identified the person depicted in photograph number two (the defendant) "as being the shooter . . . of the two individuals that were on the sidewalk" and also that Harrison distinguished the shooter as the "operat[or]" of the car from the other individual, who was the passenger.  Without that limited context integral to the identification, the jury would have received fragmented and unclear testimony.  See Commonwealth v. Watson, 377 Mass. 814, 825-831 (1979) (discussing verbal completeness doctrine); see generally M.S. Brodin & M. Avery, Massachusetts Evidence § 1.7, at 19-21 (8th ed. 2007); cf., e.g., Commonwealth v. Gaynor, 443 Mass. 245, 270-271 (2005) (finding statement about defendant involving different subject inadmissible under completeness rule).  The failure to object to what was admissible hearsay testimony does not constitute ineffective assistance. See, e.g., Commonwealth v. Cohen, 412 Mass. 375, 392 (1992); Commonwealth v. Agbanyo, 69 Mass. App. Ct. 841, 850 (2007).

In contrast, the Court regards Detective Martel's testimony that Harrison had indicated that the car was a "black Toyota" as

-121-

extraneous to the identification.  However, trial counsel's lack
of objection to that hearsay description of the car is
unremarkable; the Commonwealth had already offered evidence that
the car involved in the September 16, 2000, shootings was a black
Toyota (e.g., tr. Nov. 15, 2005, at 247-248).  "Frequently, a
trial counsel's failure to object to the introduction of evidence
. . . is not a material deviation from the standards expected of
the ordinary, fallible lawyer," where, as here, "the evidence
introduced was cumulative or nonprejudicial."  Commonwealth v.
Egardo, 426 Mass. at 52-53, citing cases; Commonwealth v. Mattos,
49 Mass. App. Ct. at 225.[18]  The Court concludes that trial
counsel's lack of objection to Detective Martel's testimony did
not constitute ineffective assistance.[19]

---

[18]At the evidentiary hearing trial counsel did not directly
answer the question whether she made a tactical decision not to
object to Detective Martel's hearsay testimony.  (See tr. Sep.
12, 2008, at 27.)  An attorney may strategically choose not to
object to brief instances of hearsay testimony so as "not to call
special attention" to unfavorable evidence.  Commonwealth v.
DeLong, 72 Mass. App. Ct. 42, 46 (2008), citing Commonwealth v.
Beliard, 443 Mass. 79, 88-89 (2004); cf. Commonwealth v. Delp, 41
Mass. App. Ct. 435, 442 (1996) ("Counsel's decision not to
request a limiting instruction may have been a tactical move not
to highlight the evidence.").

[19]Since Commonwealth v. Cong Duc Le, 444 Mass. 431 (2005),
appellate courts in Massachusetts have not directly addressed the
scope of the "contents of . . . a statement of identification,"
441 Mass. at 442, but Commonwealth v. Ragland (issued after the
parties submitted legal memoranda in this case) may be read to
allow generally, as substantive evidence under the holding of
Commonwealth v. Cong Duc Le, a police officer's testimony
regarding the details of a crime that are "embedded" in a
witness's out-of-court identification.  See 72 Mass. App. Ct.

4. <u>Failure to object to prosecutor's closing argument</u>.   The
Court disagrees with the defendant's assertion that his trial
counsel deprived him of constitutionally effective assistance by
failing to object to alleged misstatements of the evidence in the
prosecutor's closing argument (Mem. Law Supp. Def.'s Mot. at 33-
35).   Because the prosecutor's statements were not improper, "it
was not ineffective assistance of counsel to fail to object."
<u>Commonwealth</u> v. <u>Verde</u>, 444 Mass. 279, 287 (2005), citing
<u>Commonwealth</u> v. <u>Murphy</u>, 442 Mass. 485, 509 (2004).[20]

   "Prosecutors may not misstate the evidence or refer to facts
not in evidence.   <u>Commonwealth</u> v. <u>Kozec</u>, 399 Mass. 514, 516
(1987).   However, they may 'argue from the evidence and may argue
fair inferences that might be drawn from the evidence.'
<u>Commonwealth</u> v. <u>Murchison</u>, 418 Mass. 58, 59 (1994).   'Arguments
based on testimony submitted at trial and its logical conclusions

---

815, 827-829, further appellate review denied, 452 Mass. 1110
(2008) [defendant Ragland], further appellate review pending,
Commonwealth <u>vs</u>. Ragland, Supreme Judicial Court No. FAR-17509
[defendant Watson].   That reading, of course, also supports
finding that the defendant's trial counsel was not ineffective
for failing to lodge an objection to the portions of Detective
Martel's testimony at issue here.

   [20]"[T]he decision whether to object to opposing counsel's
closing is a matter of trial strategy," <u>Commonwealth</u> v. <u>Williams</u>,
450 Mass. 879, 890-891 (2008), at least where, as here, there is
no "constitutional objection to [the prosecutor's] argument,"
<u>Burns</u> v. <u>Gammon</u>, 260 F.3d 892, 897 (8th Cir. 2001).   Trial
counsel nevertheless affirmed at the evidentiary hearing that she
had no tactical reason not to object to the portions of the
prosecutor's argument at issue in this case.   (See tr. Sep. 12,
2008, at 38-39.)

are proper . . . .'  Commonwealth v. Freeman, 430 Mass. 111, 118

(1999).  See Commonwealth v. Lamrini, 392 Mass. 427, 432 (1984)

(prosecutor's comments viewed in light of entire argument)."

(Omission in original.)  Commonwealth v. Colon, 449 Mass. 207,

224 (2007).

The defendant unconvincingly characterizes the prosecutor's

statement that Harrison had a "good look" at the shooter as a

misstatement of the evidence (Mem. Law Supp. Mot. at 34).  About

a third of the way through his closing argument, the prosecutor

said, "Who does Mr. Harrison see?  Who does he have a good look

at?  The driver, the person doing the shooting."  (Tr. Nov. 30,

2005, at 76.)  While the Court agrees with the defendant that no

witness actually used the words "good look" to describe

Harrison's perception of the shooter (Mem. Law Supp. Def.'s Mot.

at 34), the Court finds the prosecutor's statement was

nonetheless proper.  From the evidence before the jury, a fair

inference might be drawn that Harrison observed the shooting for

a long enough period of time to see the shooter get out of the

driver's side of the car and start shooting,[21] and that Harrison

---

[21]Sylvester Harrison testified at trial that he saw "a quick
image" of the shooting (tr. Nov. 15, 2005, at 197), that he
thought he saw two people near a car (id.), that he thought he
had said to detectives that he saw two men get out of a Toyota
and start shooting (id. at 199), that "for a second" he did see
"somebody was shooting," (id. at 200), and that he believed that
the person he saw shooting was the same man who drove the car
(id.).

had a brief but competent look at the shooter's face, sufficient
to recognize the shooter from a small black and white
photograph.[22]  The prosecutor's statement that Harrison had "a
good look" at "[t]he driver, the person doing the shooting," was
proper argument based on the evidence before the jury and
permissible inferences drawn therefrom.  See, e.g., Commonwealth
v. Williams, 450 Mass. 879, 889 (2008), quoting Commonwealth v.
Kozec, 399 Mass. at 516 ("prosecutor may 'argu[e] forcefully for
a conviction based on . . . inferences that may reasonably be
drawn from the evidence'" [alteration in original] [omission in
original].).

        The other portion of the prosecutor's closing argument with
which the defendant finds fault (see Mem. Law Supp. Mot. at 35)
is also untroubling.  Immediately after the passage just
recounted, the prosecutor stated:

> What else does he [Harrison] say?  There was a
> second person, but I didn't see him shooting, I didn't
> even see him out of the car.
> Who does he tell Detective Martel that the driver
> looked like from that photo array?  Mr. Harrison tells

---

[22]Detective Martel testified at trial that Sylvester
Harrison selected the defendant's head-and-shoulders photograph
from the array (tr. Nov. 15, 2005, at 271), and recalled that
Harrison "said he saw the faces [of the individuals involved in
the shootings] briefly" (id. at 281).
    It is unclear from Detective Martel's testimony to whom
Harrison was referring when Harrison reportedly told the
detective, "I saw him for a couple of seconds" (id.).  It appears
from the line of questioning that "him" meant the "person that
was not the driver" (see id.).  The ambiguity does not affect the
Court's analysis.

> us it looks like, the face looked like that of Andre
> Walker.  He picks out Mr. Walker's photograph.

(Tr. Nov. 30, 2005, at 76-77.)  The defendant complains that

"[t]he prosecutor's statement that Harrison 'told us' that the

face looked like [the defendant] was blatantly false."  (Mem. Law

Supp. Def.'s Mot. at 35.)  However, the Court understands, as the

jury assumedly did, the prosecutor's inartful phraseology to mean

that, based on the testimony of Detective Martel, the

photographic identification made by Harrison indicates ("tells

us") that the face of the driver looked like that of the

defendant, see, e.g., Webster's New Int'l Dictionary 2595 (2d ed.

1961) (listing definitions and uses of "tell").  See, e.g.,

Commonwealth v. Raymond, 424 Mass. 382, 391 (1997) (examining

prosecutor's closing statement in context in which it was made to

determine what jury would likely have understood).  In the realm

of prosecutorial rhetoric, a "certain measure of jury

sophistication . . . is to be assumed."  Commonwealth v. Benson,

419 Mass. 114, 119 (1994), citing Commonwealth v. Kozec, 399

Mass. at 517, and cases cited.  Reasonably understood, the

prosecutor's statement was not improper.  See, e.g., Commonwealth

v. Colon, 449 Mass. at 224, and cases cited.

     In brief, as neither of the closing statements at issue was

improper, trial counsel was not ineffective for failing to object

to them.  See Commonwealth v. Verde, 444 Mass. at 287.

5. Failure to introduce evidence of third party confession.
Lastly, the defendant has not met his burden to prove that his
trial counsel rendered constitutionally ineffective assistance by
failing to introduce evidence of a third party "confession"
through cross-examination of Terrence Dotson or Detective Devane
(Mem. Law Supp. Def.'s Mot. at 36-41).  The decision whether to
ask certain questions at trial may be tactical, see, e.g.,
Commonwealth v. Melchionno, 29 Mass. App. Ct. 939, 940 (1990);
United States v. Richman, 600 F.2d 286, 299 (1st Cir. 1979), and
the Court accepts trial counsel's evidentiary hearing testimony
that she had no tactical reason not to further examine Dotson
about his statement to Detective Devane (tr. Sep. 12, 2008, at
42) but that she purposely declined to further examine Detective
Devane about that statement because she believed that additional
hearsay testimony on that issue would not have benefitted the
defendant (id. at 45).  A tactical decision amounts to
constitutionally ineffective assistance "only if it was
manifestly unreasonable when made."  Commonwealth v. Martin, 427
Mass. at 822; accord Commonwealth v. Clemente, 452 Mass. at 326-
327.  Based on the defendant's showing, the Court finds that the
asserted failure to elicit evidence of a third party "confession"
through cross-examination of Dotson or Detective Devane was not
ineffective assistance.

Part of the discovery provided to the defendant's trial

-127-

counsel included Detective Devane's October 9, 2000, report of

his interview with Dotson.  (Tr. Sep. 12, 2008, at 39.)   In that

report, Detective Devane wrote the following:

> Dotson stated Andre [Walker] was looking out at an
> intersection and he believes Spot [Daryl Green] got out
> of his car and may have gotten into a stolen one.
> Dotson stated Spot shot Frizz [Francis Stephens] in the
> chest and Reggie [Green] finished him in the
> head. . . .
> When asked how Dotson could possibly know all of
> these things without being there and witnessing it,
> Dotson began to waver.  Dotson stated he was involved
> in conversation in a hallway with Reggie and Richard
> Green, then changed it to over hearing [sic] a
> conversation between the Greens.  Then denied that he
> heard any conversation.
> Dotson recanted the part where Spot and Reggie
> were shooting, and stated everything else was true.

(Ex. 1 to Mem. Supp. Def.'s Mot.)   On cross-examination at trial

by the defendant's trial counsel, Dotson admitted talking to

police on October 9, 2000, but denied telling police that either

Daryl or Reggie Green had shot Francis Stephens and Jose Astacio.

(Tr. Nov. 22, 2005, at 46-47.)   When questioned further whether

he remembered making a statement to that effect to Detective

Devane, Dotson testified, "Well that was the word, I didn't tell

any date when I did tell them the date when I did it, I said that

was the word."  (Id. at 48.)   Asked if that was what he had

heard, Dotson answered, "Yeah that's what I heard, but I didn't

say, -- I mean that's what I heard."  (Id.)   On redirect

examination, Dotson agreed that he was only passing on a rumor

that "was going around the hood [sic]" and not something of which

-128-

he had personal knowledge. (Id. at 52-53.)  Detective Devane, on cross-examination by the defendant's trial counsel, admitted that Dotson "[i]nitially" made a statement to the detective that Daryl and Reggie Green, Richard Green's brothers, were the two people who had shot Francis Stephens (id. at 234); but, on redirect examination, the detective testified that Dotson "kind of made that up" and that Dotson "changed it to something he heard and then he backed of [sic] even hearing that" (id. at 245-246).

The defendant concedes that "[i]t is true that [trial] counsel elicited testimony from Dotson that he had told Det[ective] Devane that the Green brothers had been involved" but faults counsel for not "seek[ing] to introduce, either through Dotson or Det[ective] Devane, the fact that Dotson stated that he was told by the Greens (or overheard their conversation) that Daryl and Reggie Green committed the murder."  (See Mem. Law Supp. Mot. at 38 n.15.)  The defendant's several hypotheses how trial counsel rendered ineffective assistance by not eliciting that additional testimony are addressed seriatim.

First, the "possib[ility] that, if questioned, Dotson would have admitted that he made the statement and adopted its substance" (id. at 38) is extremely remote given Dotson's cross-examination testimony (see tr. Nov. 22, 2005, at 46-48), and, like the "possib[ility] that [the Commonwealth] would not have objected to the admission of the Greens' statements to Dotson"

(Mem. Law Supp. Mot. at 38), is bereft of factual support beyond what appears in the trial transcript.  "In a motion for a new trial, the burden is on the defendant to prove facts that are neither agreed upon nor apparent on the face of the record" (quotation omitted).  Commonwealth v. Comita, 441 Mass. at 93. The defendant's showing on those first two theories is insufficient to meet that burden; the defendant cites no authority to the contrary.

The defendant's argument that the hearsay statement could have been admitted as having been made against penal interest (Mem. Law Supp. Mot at 39) fails to persuade.  "A statement is against penal interest if (1) the declarant is unavailable to testify, (2) the statement so far tends to subject the declarant to criminal prosecution that a reasonable person in the declarant's position would not have made the statement unless he believed it to be true, and (3) if offered to exculpate the accused, it is corroborated by circumstances clearly indicating its trustworthiness.  All three requirements must be met." (Citation omitted.)  Commonwealth v. Burnham, 451 Mass. 517, 524 (2008).  With respect to the third requirement, "a judge should consider certain factors in light of the other evidence already adduced or to be adduced, including the credibility and reliability of the declarant and the credibility and probative value of the statement; the timing of the declaration; the

relationship between the witness and the declarant; whether the
statement was heard by others; whether the statement was made
spontaneously; whether and in what circumstances the statement
was repeated; and whether there was a motive for the declarant to
misrepresent the matter" (quotation omitted).  Id. at 525; see
Commonwealth v. Drew, 397 Mass. 65, 75-76 (1986).

    Here, at the outset, there is the fundamental problem that
the identity of the alleged declarant -- Reggie or Richard Green
-- is unknown; on the record before the Court, a declaration by
Richard Green that Reggie and Daryl Green killed Francis Stephens
could only be a statement against penal interest if Reggie Green
adopted it.  If the "alleged declaration against interest took
the form of an alleged adoptive admission, the defendant must
also show 'that the party [Reggie Green] has heard and understood
the statement, that he had an opportunity to respond, and that
the context was one in which he would have been expected to
respond to an accusation.'"  Commonwealth v. Tague, 434 Mass.
510, 515 (2001), quoting Commonwealth v. Olszewski, 416 Mass.
707, 719 (1993).  The defendant's elision of that issue, by
assuming that Reggie Green was the declarant (see Mem. Law Supp.
Mot. at 38), falls short of establishing facts that are "neither
agreed upon nor apparent on the face of the record," Commonwealth
v. Bernier, 359 Mass. at 15; Commonwealth v. Comita, 441 Mass. at
93.  Apart from that problem and presuming that the first two

-131-

requirements are otherwise satisfied,[23] the defendant fails to prove "some reasonable likelihood that the statement could be true," Commonwealth v. Drew, 397 Mass. at 76; Commonwealth v. Weichell, 446 Mass. 785, 803 (2006).  See Commonwealth v. Dew, 443 Mass. 620, 631 (2005).[24]  Here again, the defendant, who

---

[23]Where a declarant likely would invoke the right against self-incrimination under the Fifth Amendment to the United States Constitution, "it is appropriate to conclude that the unavailability requirement has been satisfied." Commonwealth v. Burnham, 451 Mass. 517, 524 (2008), citing Commonwealth v. Charles, 428 Mass. 672, 679 (1999).  As to the second requirement, while the alleged declaration could have been braggadocio rather than a statement against criminal interest, see United States v. Seabolt, 958 F.2d 231, 233 (8th Cir. 1992), even an "empty boast which was never meant to reach the ears of the authorities" may be sufficiently disserving, Commonwealth v. Keizer, 377 Mass. 264, 271 (1979).

[24]With respect to the factors discussed in Commonwealth v. Drew, 397 Mass. 65, 76-78 (1986): neither the identity of the alleged declarant nor specifics of the alleged statement is known (although, to the extent relevant, it may be presumed that Richard Green -- the asserted leader of the Franklin Hill Giants [e.g., tr. Nov. 21, 2005, at 92-93] -- has "questionable" character, see, e.g., Commonwealth v. Weichell, 446 Mass. 785, 805 [2006]); there was evidence that Reggie and Daryl Green were not associated with the Franklin Hill Giants (tr. Nov. 21, 2005, at 32), but several witnesses identified Daryl Green from exhibit 35 (e.g., tr. Nov. 18, 2005, at 106; tr. Nov. 22, 2005, at 180); the alleged statement does not reveal detailed, intimate knowledge of the crime but is consistent with the fact that Francis Stephens was shot in the head and chest (e.g., tr. Nov. 18, 2005, at 192-211); the alleged statement conflicts with Daryl Green's testimony concerning his whereabouts at the time of the shootings (see id. at 52-55), but his testimony was contradicted by Omar Greene (see tr. Nov. 21, 2005, at 154) (whose testimony on that point was contradicted by Jose DeJesus [tr. Nov. 22, 2005, at 180]), and even the prosecutor argued in closing that Daryl Green's story was "a little too convenient" (tr. Nov. 30, 2005, at 88-89); no indication appears as to when the alleged statement was made between September 16, 2000, and October 9, 2000, or the circumstances under which it reportedly was given

bears the burden of proving facts sufficient to support his

postconviction claim, Commonwealth v. Comita, 441 Mass. at 93,

has not met his burden.

The defendant's related argument based on Chambers v.

Mississippi, 410 U.S. 284 (1973) (Chambers) and Green v. Georgia,

442 U.S. 95 (1979) (Green), (Mem. Law Supp. Mot at 39) is even

less persuasive.  Those cases are readily distinguishable:

> In Chambers, [410 U.S. 284 (1973),] the defendant was
> prevented under Mississippi's evidentiary rules from
> cross-examining one McDonald, who had confessed to the
> crime but subsequently recanted, and from introducing
> the testimony of witnesses to McDonald's confessions.
> The Supreme Court reversed the conviction because the
> indicia of trustworthiness of McDonald's confessions
> were so overwhelming that exclusion of evidence of the
> confession was a violation of fundamental fairness.
> McDonald was not a codefendant, had spontaneously
> confessed the crime to close friends on three separate
> occasions within twenty-four hours of its occurrence,
> and gave a subsequent sworn confession.  Id. at
> 287-300.  In addition, one eyewitness stated that he
> saw McDonald shoot the victim, and another stated that
> he had seen McDonald with a gun in his hand immediately

---

(other than "in a hallway"); there was testimony at trial that
Dotson was friendly with people from Franklin Hill (e.g., tr.
Nov. 15 at 29) but not that he was part of the Franklin Hill
Giants, and nothing to show Dotson's relationship with either
Richard or Reggie Green; there is no indication whether other
people heard the alleged statement, whether it was repeated, or
whether there is any apparent motive for the declarant to
misrepresent the matter.

Application of those factors leads the Court to find that
the alleged statement is not "corroborated by circumstances
clearly indicating its trustworthiness," Commonwealth v. Burnham,
451 Mass. 517, 524 (2008); see Commonwealth v. Drew, 397 Mass. at
73.  "The absence of circumstances that disprove [an alleged]
statement does not constitute 'a reasonable likelihood that the
statement could be true.'"  Commonwealth v. Dew, 443 Mass. 620,
631 (2005), quoting Commonwealth v. Drew, 397 Mass. at 76.

after the shooting, so that each confession was
corroborated by some other evidence.  Id. at 289, 300.
Finally, McDonald was available as a witness and could
have been cross-examined.  Id. at 301.

Similarly, in Green v. Georgia, 442 U.S. 95 (1979)
(per curiam), the Supreme Court held that it was a
violation of due process to exclude on grounds of
hearsay a codefendant's confession that was "highly
relevant to a critical issue in the punishment phase of
the trial . . . and [where] substantial reasons existed
to assume its reliability."  Id. at 97.  The Court
analyzed the case as follows:  "The evidence
corroborating the confession was ample, and indeed
sufficient to procure a conviction of Moore [the
codefendant] and a capital sentence.  The statement was
against interest, and there was no reason to believe
that Moore had any ulterior motive in making it.
Perhaps most important, the State considered the
testimony sufficiently reliable to use it against
Moore, and to base a sentence of death upon it."  Id.
(Second and third alterations in original.) (Omission
in original.)

Commonwealth v. Drew, 397 Mass. at 71-72.  Here, in stark

contrast, the circumstances of the statement reportedly made

between Reggie and Richard Green do not "provide[] considerable

assurance of [the statement's] reliability," Chambers v.

Mississippi, 410 U.S. at 300, nor do "substantial reasons exist[]

to assume its reliability," Green v. Georgia, 442 U.S. at 97.

The defendant cites no case that would support his contention

that a "confession" reportedly made by or to one of Francis

Stephens's shooters, who "perhaps" had a strong retaliatory

motive (Mem. Law Supp. Mot. at 39) as such bears "indicia of

trustworthiness . . . so overwhelming that exclusion of evidence

of the confession [would have been] a violation of fundamental

fairness," Commonwealth v. Drew, 397 Mass. at 71; see Chambers v.

Mississippi, 410 U.S. at 287-300.  "A defendant does not have a constitutional right to the admission of unreliable hearsay statements," Commonwealth v. Piper, 426 Mass. 8, 11 (1997), and "Federal and State courts have expressed the belief that Chambers has not significantly trammeled judicial discretion to exclude unreliable declarations against penal interest," Commonwealth v. Carr, 373 Mass. 617, 625 (1977).  "Generally, Chambers-based claims have been consistently rejected by the courts," Commonwealth v. Drew, 397 Mass. at 72 n.6, citing cases, and the defendant's claim is not an exception.

Neither the defendant's penultimate argument, that Dotson's statement was admissible as a prior inconsistent statement, nor his final argument, that the jury might have given substantive consideration to testimony that was limited to its impeachment value, (see Mem. Law Supp. Mot. at 39-40) carries force as a predicate to a valid ineffective assistance claim.  As to the former, "[i]n general, failure to impeach a witness does not prejudice the defendant or constitute ineffective assistance," Commonwealth v. Bart B., 424 Mass. 911, 916 (1997); Commonwealth v. Hudson, 446 Mass. 709, 715 (2006); accord Commonwealth v. Morales, 453 Mass. 40, 49 (2009), and, in the circumstances involved here, "it is speculative to conclude that a different approach to impeachment would likely have affected the jury's conclusion," Commonwealth v. Fisher, 433 Mass. 340, 357 (2001);

Commonwealth v. Hudson, 446 Mass. at 715.  At trial, Dotson's
credibility was extensively impeached by counsel for the
defendant and counsel for the codefendant.  (See tr. Nov. 22,
2005, at 42-52.)  A lawyer need not "pursue every possible avenue
in order to forestall an ineffective assistance claim."
Commonwealth v. Britto, 433 Mass. 596, 604 (2001); Commonwealth
v. Knight, 437 Mass. 487, 502 (2002).  With respect to the latter
argument, it may be that in practice some juries fail to
appreciate the distinction between substantive and impeachment
evidence (see Mem Law. Supp. Def.'s Mot. at 39-40), but the Court
must presume as a matter of law "that a jury understands and
follows limiting instructions," Commonwealth v. Jackson, 384
Mass. 572, 579 (1981), citing Commonwealth v. Leno, 374 Mass.
716, 719 (1978); Commonwealth v. Donahue, 430 Mass. 710, 718
(2000).  "[I]n a case where ineffective assistance of counsel is
charged, there ought to be some showing that better work might
have accomplished something material for the defense."
Commonwealth v. Satterfield, 373 Mass. 109, 115 (1977); accord
Commonwealth v. Smith, 449 Mass. 12, 22 (2007).  The defendant
has not made that showing here.

     At bottom, the Court cannot conclude that the defendant has
proven the constitutional ineffectiveness of his trial counsel
for failing to elicit from Dotson or Detective Devane an
inadmissible hearsay statement as substantive evidence, see

-136-

Commonwealth v. Nerette, 432 Mass. 534, 538 (2000); Commonwealth

v. Marrero, 60 Mass. App. Ct. 225, 230-231 (2003), or for failing

to elicit that statement, as a prior inconsistent statement, to

impeach Dotson, see Commonwealth v. Hudson, 446 Mass. at 715, and

cases cited.

   6. Conclusion.  "Where a new trial is sought based on a

claim of ineffective assistance of counsel, the burden of proving

ineffectiveness rests with the defendant." Commonwealth v.

Montez, 450 Mass. at 755, citing Commonwealth v. Comita, 441

Mass. at 90.  As explained, the Court finds that the defendant

has failed to meet his burden of proving that his trial counsel

rendered constitutionally ineffective assistance under the

standards set forth in Commonwealth v. Saferian, 366 Mass. 89

(1974), or Strickland v. Washington, 466 U.S. 668 (1984).


                              ORDER

   It is therefore ORDERED that defendant Andre Walker's Motion

for a New Trial be DENIED.



                         _____
                              Raymond J. Brassard
                              Justice of the Superior Court


DATED:  11 Feb. 09


                              -137-